Schlesinger Appeal.

Argued March 17, 1961.   Before JONES, C. J., BELL, JONES, COHEN, BOK and EAGEN, JJ.

reargument refused July 31, 1961.

*John K. Tabor* and *Richard B. Tucker, Jr.*, with them *Charles F. C. Arensberg, John G. Buchanan, Louis Caplan, Thomas N. Griggs, Louis C. Glasso*, and *James Craig Kuhn, Jr.*, for appellant.

*Robert A. Rundle*, with him *Francis Taptich*, for appellee.

*Samuel M. Koenigsberg*, of the New Jersey Bar, and *Norman Leonard* and *Ewing Sibbett*, for National Lawyers Guild, amicus curiae.

OPINION BY MR. CHIEF JUSTICE JONES, July 18, 1961:

Hymen Schlesinger, the appellant, was admitted to the bar of Allegheny County on September 24, 1927, and, continuously thereafter engaged in the practice of law in that county with offices in the City of Pittsburgh. On May 26, 1950, the Committee on Offenses of the Court of Common Pleas of Allegheny County lodged with him a written complaint charging him with "professional misconduct."  As a result of hearings on the complaint, held by a Subcommittee of the Committee on Offenses, the Court of Common Pleas of Allegheny County ten years later (viz., on May 10, 1960) entered an order disbarring Schlesinger on the basis of the

report and recommendation of the Committee on Offenses. The principal charge against the respondent was that he had violated his oath as an attorney by being a member of the Communist Party. No charge was made nor proof adduced that he had ever been guilty of unprofessional conduct in his relations with any of his clients or with the courts. Upon his appeal to this court from the order of disbarment, we entered an order on May 23, 1960, upon his petition for a supersedeas, suspending the order of disbarment until final disposition of the appeal, which is now before us for that purpose.

A recital of the proceedings, somewhat in detail, is essential to a proper understanding and consideration of the important questions presented by the record. Moreover, it is our bounden duty under Section 1 of the Act of May 19, 1879, P.L. 66, 17 PS §1663, to review the case de novo.

The complaint filed with Schlesinger by the Committee on Offenses on May 26, 1950, specifically charged him with "professional misconduct" (a) "[b]y being a member of the Communist Party, one of the major aims and purposes of which party is the overthrow of the Government of the United States by force and violence", (b) "[b]y acting as a party functionary in connection with the activities of the Communist Party in the City of Pittsburgh, Pennsylvania, and in that capacity assisting in the formulation and the carrying out of party policies, especially with reference to the organization and control of basic industries in the Pittsburgh district," and (c) "[b]y actively advocating and supporting the aforesaid aim and purpose of the Communist Party to overthrow the Government of the United States by force and violence in derogation and in violation of the oath taken by Respondent upon his becoming a member of the bar of the Court of Common Pleas of Allegheny County, Pennsylvania."

A motion to dismiss the complaint was filed by the respondent.

On September 29, 1950, the Committee on Offenses appointed a Subcommittee of three of its own members to hear argument on the motion to dismiss the complaint and to make a report to the Committee. Thereafter, the subcommittee recommended that the motion to dismiss be denied and that the respondent be directed to file an answer to the complaint. This recommendation was in due course approved by the Committee. On June 6, 1951, a request for a bill of particulars was filed with the Committee on Offenses by the respondent. This request was denied. The respondent then challenged for cause each and every member of the Committee on Offenses because, inter alia, of their conflicting capacities. This challenge was also denied.

Before a date for a hearing on the complaint had been fixed by the Subcommittee, an information was filed by one Matt Cvetic with a justice of the peace in the county charging the respondent with a violation of the Pennsylvania Sedition Act of 1951, on which charge the respondent was held for court. As the allegations of Cvetic in his information against Schlesinger were similar to the charges in the Committee's complaint against him, the Subcommittee took no action with respect to a hearing on the complaint while Cvetic's criminal prosecution of the respondent was pending. The criminal proceeding was quashed on December 11, 1951, by three judges of the Court of Common Pleas, sitting en banc, for the stated reasons that "our judicial criminal procedure was ignored if not flaunted," that "the defendant was denied his state constitutional and statutory rights and protection," and that "the admitted activities or nonactivities following his arrest denied to the defendant due process of law and equal protection of the law under the 14th Amendment of the United States Constitution."

Nothing further, in respect of the Committee's complaint, appears to have been done following the quashing on December 11, 1951, of the criminal proceeding instituted by Cvetic until May 1, 1953, when the Subcommittee gave notice to the respondent of a hearing on the complaint. The hearing was still further delayed, however, for about eight months because of the respondent's unsuccessful attempts to enlist at that time the services of counsel in his behalf. It is a lamentable commentary, but none the less true, that, in the existing frame of the public mind, a lawyer who undertakes voluntarily the legal representation of a person charged with being, or even pointed at (in *J'accusé* fashion) as, a Communist runs the risk of a disruption of his law practice and the impairment of his own professional reputation.

In any event, hearings on the Committee's complaint were begun and proceeded with before the Subcommittee on various dates in January, February and August of 1954, the respondent then being unrepresented by counsel. Further hearings were held on February 9, 17 and 22, and March 22, 1955, for the purpose of receiving testimony of witnesses produced by respondent, who was still without counsel other than himself.

After the final hearing on March 22, 1955, and as a result of respondent's supplication of the Allegheny County Bar Association, among other civic or public bodies, a group of attorneys agreed to act as counsel for respondent under appointment by the Court of Common Pleas; and, on June 1, 1956, eight capable and highly regarded lawyers, consisting of four seniors and four juniors, were appointed by the Court of Common Pleas to represent the respondent. Since then, the services of these attorneys in their faithful and zealous representation of their client, including their able brief and oral argument in this court, have been in the finest traditions of the profession, e.g., that legal representation shall not

be denied anyone called to answer a charge against himself in an American court of justice.

Summations and oral argument on the basis of the testimony previously adduced at the hearings before the Subcommittee were made before that body on September 22, 1956, by counsel for the Committee and by respondent's lately appointed counsel, and briefs were filed. Thereafter, the Subcommittee filed its report finding that the respondent was a member and functionary of the Communist Party and concluded therefrom that he had been guilty of professional misconduct "in that he has violated the oath administered to him at the time of his admission to the Bar." The Subcommittee accordingly recommended that respondent be disbarred. On April 15, 1957, the Committee on Offenses adopted and filed in the Court of Common Pleas the report and recommendation of the Subcommittee recommending the respondent's disbarment.

Exceptions to the report and recommendation were filed by counsel on behalf of the respondent. These exceptions were argued before a court en banc, consisting of three judges of the Court of Common Pleas of Allegheny County, on December 18, 1957. Two and a half years later, viz., May 3, 1960, the court en banc (one member having died in the meantime) filed an opinion dismissing respondent's exceptions and recommending to the Board of Judges of the Court of Common Pleas (consisting of sixteen members) that the respondent be disbarred, and on May 10, 1960, the Board of Judges adopted the recommendation of the court en banc and entered the order disbarring Schlesinger, which is the subject of the present appeal.

The Subcommittee had opened its case at the first hearing by introducing in evidence the oath, which respondent took upon his admission to the bar, as follows: "You do solemnly swear that you will support the Constitution of the United States and the Constitu-

tion of this Commonwealth and that you will behave yourself in the office of attorney within this court to the best of your learning and ability, and with all due fidelity as well as to the court as to your client, that you will use no falsehood nor delay any person's cause for lucre or malice and that as you shall answer to God at the last great day."

The Committee then called the respondent, who was unrepresented by counsel, as for cross-examination, but, upon his objection that it was premature to require him to testify when no case against him had been developed, the Committee deferred taking his testimony until after its witnesses, viz., George Dietze, Joseph Mazzei, Mary Mazzei and Matt Cvetic, had been called to testify. These witnesses were the only persons produced by the Committee to support the charges of the complaint.

Subsequent to the hearing, the veracity of one of these witnesses, Joseph Mazzei, was "wholly discredited" by disclosures of the Solicitor General of the United States in connection with a case then pending before the Supreme Court of the United States. See *Mesarosh v. United States,* 352 U.S. 1 (1956). The Subcommittee, in its report, stated that its decision and findings "do not depend upon the testimony of Joseph Mazzei." But, apparently, the Subcommittee had not entirely disabused its mind of Mazzei's testimony, for a summarization of it was included in the Subcommittee's report. However, the brief for the full Committee in this court contains the following confirmatory rejection of Mazzei's testimony: "before its Report was filed, the Subcommittee had knowledge of the opinion of the United States Supreme Court in the case of Mesarosh, alias Nelson, et al. v. United States, 352 U.S. 1, (1956), impeaching Mr. Mazzei as a reliable witness and the Subcommittee disregarded the testimony of Mr. Mazzei in arriving at the Findings of Fact contained in its

Report (108 P.L.J. 166)." Rightly, therefore, Mazzei's testimony must be rejected as wholly untrustworthy.

The brief for the Committee also concedes that Mrs. Mazzei's "testimony generally was not significant to the issue in this case". Consequently, support for the Committee's charge against respondent is left to rest solely on the testimony of the Committee's two remaining witnesses, George Dietze and Matt Cvetic.

Dietze testified that he was employed by the FBI from January or February of 1940 to March, 1950, and that, pursuant to such employment, he became a member of the Communist Party in March, 1944. At that time he was a piano teacher and, from 1939 to May, 1949, had his place of business at 440 Wood Street, Pittsburgh. He testified on direct examination that various Communist organizations met there on occasion; that he acted as door keeper for such meetings; that the respondent attended about fifteen meetings of the Tom Paine Club, which Dietze described as a branch of the Communist Party, during the years 1946 to 1948; and that such meetings were closed to persons other than members.

On cross-examination, Dietze testified that he let in anybody who came to the door. "I was up there and let everybody in for meetings and who they were I don't know," he explained. He testified that other groups held meetings at his place of business, including the International Workers' Organization, the Progressive Party, and the Civil Rights Congress. He conceded that he did not know one group from another or the connection between the persons he admitted and the various groups. He extenuated,—"You see, I might villify myself. You see, I couldn't ask anybody who of those groups come up, because this was quite a danger— not a danger, but they would get suspicious, what are the interests of yourself in what is going on? You see, after all, the FBI told me, 'Now, you just let them in

and out and see what you can see.' 'After all, we wired your place and we have all the evidence up there, we know what is going on.' And, for my part, as I said, probably I want to mention this now too, I wasn't sitting in these meetings either . . ." At another point in cross-examination by the respondent, Dietze said, "Mr. Schlesinger, I told you lots of organizations came up . . . I can't inquire or ask these people, who are you, what is the name of your organization, and I tried it once, and of course, you know, 'It's none of your business', and so and so on. Since this place was so occupied during the six years on 440 Wood Street I certainly could not put my nose into each individual group and ask questions, so and so on. And so I just looked at it, because, after all, the FBI know it, they know that." Dietze further testified that he did not know what took place at the meetings which he said the respondent attended, that he, himself, never attended any such meetings, that he did not know whether the respondent held any position or office in the Communist Party, and that he never discussed Communist matters with him. By the time Dietze concluded his testimony, very little, if anything, of probative value was left.

The remaining witness produced by the Committee was Matt Cvetic. He testified that he was employed by the FBI from the spring of 1941 to February, 1950, and that, pursuant to such employment, he became a member of the Communist Party in February, 1943, and was assigned to the Tom Paine branch of the Party. He testified he attended many meetings of Communist groups with the respondent. Most of these meetings concerned the Civil Rights Congress which Cvetic described as "a legal arm of the Communist Party." In answer to a question from the Subcommittee, Cvetic admitted that the Civil Rights Congress included many persons who were not Communists and, on cross-examination, admitted that a number of the Congress's prin-

cipal officers were not Communists. He testified that the principal activity of the Civil Rights Congress was to supply defense counsel in cases involving members of the Communist Party and other minority groups.

Schlesinger was charged, as already stated, with being a "functionary" of the Communist party. In support of the charge, the Subcommittee permitted Cvetic to define the word "functionary" and then to give his opinion that the respondent came within Cvetic's personal definition. Having stated that "[a] Party functionary is one who is active in a certain phase of Communist activity," Cvetic then testified that "Mr. Schlesinger was a member of the Legal Commission of the Communist Party, he would be a Communist Party functionary, one who is functioning in this capacity." Thus, the respondent was charged with an activity not defined until the hearing thereon when the Committee permitted it to be defined by the witness called to testify to the charge against the respondent. Cvetic also testified that he collected respondent's Communist Party dues on several occasions.

The respondent sought to cross-examine Cvetic in order to show his bias, prejudice, interest and general antagonism toward the respondent and also to lay the groundwork for impeaching the witness' credibility in various particulars, especially in his self-contradictory statements. However, the Subcommittee severely restricted the respondent's attempted cross-examination of Cvetic by rejecting most of his offers of proof and requests in such connection.

At the conclusion of Cvetic's testimony, the Committee again called the respondent, who was still uncounseled, as for cross-examination. He testified as to his residence, his admission to the bar and the location of his offices, but refused to answer any questions concerning his alleged membership in or connection with the Communist Party (1) on the ground that the Com-

mittee had no right to inquire into his political beliefs, ideas, affiliations or associations because of the protection afforded him by the First Amendment of the Federal Constitution and the cognate section of the State Constitution, and (2) on the ground of privilege against self-incrimination under the Fifth Amendment to the Federal Constitution and, also, under the State Constitution.

Respondent called a number of character witnesses who testified to many years' acquaintance with him, and to his good reputation for honesty, reliability, generosity, loyalty and patriotism. None of these witnesses had ever known appellant to say or do anything disloyal or subversive.

The right to practice law is constitutionally protected as a property right and no attorney can lawfully be deprived of such right except by due process of law and upon competent and relevant proofs sufficiently credible to support a just order of disbarment.

The Supreme Court of the United States recognized long ago that "The attorney and counsellor, being, by the solemn judicial act of the court, clothed with his office, does not hold it as a matter of grace and favor. . . . It is a right of which he can only be deprived by the judgment of the court, for moral or professional delinquency." *Ex Parte Garland,* 71 U.S. 333, 379 (1886). In *Schlesinger Petition,* 367 Pa. 476, 481, 81 A. 2d 316 (1951), we had occasion to declare that the right to practice law is a right so valuable that it " 'may neither be extinguished, abated nor dismissed by any proceeding short of one which fully comports with the historical and constitutional requisites of due process.' "

The record in the instant case plainly discloses that the appellant was deprived of his constitutional right to practice his profession by the order of disbarment entered by the court below as the result of a proceeding which manifestly violated the requirements of due proc-

ess in that the respondent was not afforded the full, fair and impartial hearing to which he was entitled.

The functions of prosecutor, judge and jury were combined in one body, namely, the Committee on Offenses, which lodged and prosecuted and, through its Subcommittee of three of its own members, adjudicated the charge of unprofessional conduct whereon the Court of Common Pleas, without any hearing of witnesses, ultimately entered the order disbarring the appellant. The full Committee on Offenses consisted of fifteen members of the Bar of Allegheny County, jointly appointed by the President Judge of the Court of Common Pleas of the County and the President of the Allegheny County Bar Association. This Committee, acting on its own initiative, lodged with Schlesinger the complaint charging him with "professional misconduct." The Committee appointed counsel to prosecute, on its behalf, the charges before its Subcommittee, to which the Committee referred the complaint for hearing, report and recommendation thereon. The appellant challenged for cause each of the members of the Committee on the ground, inter alia, that "Each said member individually and jointly with all other members of the Committee is a complaining party herein and is attempting to sit in judgment upon his own cause." The challenge was rejected. The Committee, as prosecutor, called and examined its witnesses against the appellant and vigorously conducted an adversary proceeding against him before its own Subcommittee which, as judge, presided over the hearings, passed upon the credibility of the witnesses, determined the inferences to be drawn from their testimony, and deduced therefrom the facts which it found. The Committee also passed upon and approved the *quantum* of compensation to be paid its witnesses.

In *In Re Murchison*, 349 U.S. 133, 136 (1955), the Supreme Court, in reversing two convictions for con-

tempt of court, declared that "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. . . . This Court has said . . . that 'every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law.' Tumey v. Ohio, 273 U.S. 510, 532."

Here, a member of the bar, charged with unprofessional conduct by a bar Committee on Offenses, was prosecuted on the Committee's complaint before a Subcommittee, composed of three members of the Committee, sitting as the trial tribunal. In such a procedure, so contrary to traditional American juridical concepts, unfairness was, ipso facto, inherent; it was fraught with the possibility of temptation to each member of the trial tribunal to favor, consciously or unconsciously, the prosecuting body which appointed him and of which he was a member. The record as a whole contains a reasonable basis for doubt as to whether impartiality on the part of the members of the tribunal was completely absent and suggests an unsympathetic predisposition toward the appellant. Moreover, a predilection to favor one side over the other is not required in order to vitiate a judical proceeding as being violative of due process. Merely, "a possible temptation to the average man as a judge . . . not to hold the balance nice, clear and true" is sufficient. Such "a possible temptation" was implicit in the proceeding before the prosecutor's own Subcommittee which resulted in appellant's disbarment.

In *Blenko v. Schmeltz*, 362 Pa. 365, 67 A. 2d 99 (1949), the President of the Board of Managers of the Patent Law Association of Pittsburgh wrote Blenko, a member of the Association, a letter notifying him that his conduct in connection with a transaction with the Patent Office had been investigated by the Board and that, unless he resigned from the Association and as a member of the bar of all courts before which he was eligible to practice, proceedings for his expulsion on the ground of unprofessional conduct would be held before the Board. On appeal to this Court, we reinstated a preliminary injunction restraining the Board of Managers from conducting such a proceeding on the ground that "the defendant board, in violation of elementary principles, was acting as prosecutor and trial tribunal at the same time." In like manner, here, the Committee on Offenses, in violation of "elementary principles" of fairness, acted as prosecutor while at the same time a Subcommittee of its own members was sitting in judgment on the Complaint as the trial tribunal.

The court below, in an effort to justify the procedure pursued by the Committee on Offenses and its Subcommittee in this case, cited *Montgomery County Bar Association v. Rinalducci*, 329 Pa. 296, 197 A. 924 (1938), where we approved the "reference of disbarment hearings to committees and the like." But we have never, in the *Rinalducci* case or in any other case, approved a merger of the prosecuting and judicial functions in one body. Such a question was not even raised in the *Rinalducci* case, much less passed upon. The procedure followed by the Committee in the present case differs radically from what we approved in *In Re Disbarment Proceedings*, 321 Pa. 81, 184 Atl. 59 (1936), which the court below also cited. In that case, the Committee of Censors of the Philadelphia Bar Association investigated the professional conduct of several attorneys and filed a report with the Court of Common

Pleas of Philadelphia County charging them with un-professional conduct. On the basis of the report, the Court issued a formal citation against the attorneys in question and a trial of the charges against them was had *before the President Judges of the then five num-bered Common Pleas Courts of Philadelphia.* The Com-mittee of Censors acted as prosecutor only; it did not function in any manner as judge, nor did it appoint a subcommittee of its own members to act as the trial tribunal.

When the report and recommendation of the Com-mittee on Offenses was filed with the Court of Common Pleas of Allegheny County on May 15, 1957, at No. 1608 July Term 1957D, the accused was then entitled *only* to file exceptions to the report and recommenda-tion, which he did. His exceptions were later argued by his counsel before the court en banc, consisting of a panel of three of the Court's sixteen judges. There was never a trial de novo of the complaint against the appellant before the court itself. On the contrary, the court en banc treated the Committee on Offenses, acting through its Subcommittee, as an independent quasi-judicial body invested with the fact finding power of a trial court and accepted its findings of fact as not re-viewable on the merits except for want of evidence to support them.

On the record in this case, it is beyond even captious question that the complainant Committee on Offenses acted, directly and through its Subcommittee (consist-ing of three of its own members), as prosecutor, judge and jury at the hearing on the Committee's own com-plaint against the appellant. This fundamentally fatal procedural defect deprived the appellant of the "fair" hearing to which due process of law entitled him. The proceeding was thereby completely vitiated and, as a consequence, legally incapable of supporting the order of disbarment entered by the court below solely on the basis of the Committee's report and recommendation.

But, over and above that, the testimony of the Committee's witnesses, which the Subcommittee, as the trial tribunal, accepted and presumably accredited, was insufficient, as a matter of law, to convict the appellant of professional misconduct.

The complaint, which so charged him, contained, as already listed, three specifications in support of the charge. The first specification accused him of being "a member of the Communist Party, one of the major aims and purposes of which Party is the overthrow of the Government of the United States by force and violence." The Subcommittee found that the appellant was a member of the Communist Party. But, that finding alone did not suffice for the Subcommittee's conclusion that he was guilty of unprofessional conduct. Culpability does not attach merely from membership in the Communist Party. The Supreme Court of the United States has clearly so confirmed. In *Schneiderman v. United States,* 320 U.S. 118, 136 (1943), in discussing membership in the Communist Party, that Court said that "under our traditions beliefs are personal and not a matter of mere association, and that men in adhering to a political party or other organization notoriously do not subscribe unqualifiedly to all of its platforms or asserted principles."

What the Supreme Court said in *Konigsberg v. State Bar of California,* 353 U.S. 252, 267-268 (1957), is strikingly apposite here, as the bracketed inserts of names and years relevant to the instant case, placed in juxtaposition in the quotation following, will at once make plain: "Even if it be assumed that Konigsberg [Schlesinger] was a member of the Communist Party in 1941 [1946-1950], the mere fact of membership would not support an inference that he did not have good moral character. There was no evidence that he ever engaged in or abetted any unlawful or immoral activities—or even that he knew of or supported any actions

of this nature. It may be, although there is no evidence in the record before us to that effect, that some members of that party were involved in illegal or disloyal activities, but petitioner cannot be swept into this group solely on the basis of his alleged membership in that party. In 1941 [1946-1950] the Communist Party was a recognized political party in the State of California [Pennsylvania]. Citizens of that State were free to belong to that party if they wanted to do so. The State had not attempted to attach penalties of any kind to membership in the Communist Party. Its candidates' names were on the ballots California [Pennsylvania] submitted to its voters. Those who accepted the State at its word and joined that party had a right to expect that the State would not penalize them, directly or indirectly, for doing so thereafter." (Footnotes omitted).[1] It was not until a year and a half after the complaint of the Committee on Offenses against the appellant was lodged with him on May 26, 1950, that the Communist Party was outlawed in Pennsylvania by the Act of December 21, 1951, P.L. 1712, 18 PS §3811.

Membership in the Communist Party has been held not to be indicative of non-attachment to the principles of the Constitution of the United States. See *Nowak v. United States*, 356 U.S. 660 (1958); *Maisenberg v.*

---

[1] The later decision of the Supreme Court in *Konigsberg v. State Bar of California*, 366 U. S. 36 (1961), in no way derogates from what the Court said in the first *Konigsberg* case relative to the applicant's alleged membership in the Communist Party. California's second rejection of Konigsberg's application for admission to the bar in that State was not based upon the fact that he was a member of the Communist Party. The sole ground for the Supreme Court's affirmance of California's refusal of Konigsberg's application was that he had obstructed the California Committee of Bar Examiners in the performance of its duty by refusing, after having first been given due warning of the consequences, "to provide unprivileged answers to questions having a substantial relation to his qualifications."

*United States,* 356 U.S. 670 (1958) ; *Schneiderman v. United States,* 320 U.S. 118 (1943). These holdings of our highest tribunal faithfully comport with Jefferson's classic admonition in his First Inaugural Address that "If there be any among us who would wish to dissolve this Union or to change its republican form, let them stand undisturbed as monuments of the safety with which error of opinion may be tolerated where reason is left free to combat it."

In *Schware v. Board of Bar Examiners of New Mexico,* 353 U.S. 232 (1957), the Board refused to permit Schware to take the bar examination on the ground that he had not shown good moral character. The Supreme Court of New Mexico upheld the Board's rejection of the applicant for the reason, inter alia, that Schware was a member of the Communist Party. On appeal, the Supreme Court of the United States held, without dissent, that the evidence, including the fact of the applicant's Communist membership, did not support a finding that he lacked "good moral character" and that the State of New Mexico had deprived him of due process in denying him the opportunity to qualify for the practice of law. Since the requirements of due process prohibit a State from denying an applicant the opportunity to qualify for the practice of law because of membership in the Communist Party, a fortiori, should the requirements of due process prohibit a State from disbarring an attorney because of his membership in the Communist Party particularly when limited to a time during which the Party was a legally recognized political party in the State.

As to the aims and purpose of the Communist Party, as alleged in the latter part of the first specification, the Subcommittee, as the trial tribunal, assumed by an exercise of judicial notice that one of the major aims and purposes of the Communist Party is the overthrow of the Government of the United States by force and

violence, saying, in that connection, that "in this hearing [we] will not consider and take testimony upon the aims, objects, and purposes of the Communist Party, since the Subcommittee feels that the aims, purposes, and objects of the Communist Party have been sufficiently determined both legislatively and judicially." As authority for this conclusion, the Subcommittee relied upon *Albert Appeal,* 372 Pa. 13, 92 A. 2d 663 (1952), which involved the dismissal of a school teacher by the Board of Public Education of Allegheny County for alleged communistic affiliations. The hearing at which testimony as to the aims and purposes of the Communist Party was excluded was before the Board, an administrative body from whose decision the accused had a right of appeal to a court and a trial de novo. Recognizing that fact, this court said (p. 22), "appellant could have obtained a hearing de novo in the Court of Common Pleas had she requested it and could there have asserted her right to present evidence designed to show that the Communist Party is not a subversive organization. Not having done so she is not now in a position to complain."

No such opportunity was ever afforded the present appellant either before the Subcommittee or in the Court of Common Pleas. Counsel for the appellant have appropriately filed with us a motion for leave to present evidence to show that the aims and purposes of the Communist Party, at the times of the acts complained of in the Committee's complaint, were not the overthrow of the Government of the United States by force and violence. Were it not for the fact that vacation of the order of the court below disbarring appellant is plainly so indicated otherwise, we would be compelled to grant the motion and give the appellant an opportunity to present such evidence in order to satisfy the requirements of due process of law. As recognized in *Albert Appeal,* supra, "the presumption created by

the doctrine of judicial notice is not a conclusive one but is subject to rebuttal." In *United States v. Aluminum Company of America,* 148 F. 2d 416, 446 (C.A. 2nd Cir., 1945), Judge LEARNED HAND, speaking for the Court, said, "Even though we took 'notice' of these [aluminum production figures in the "Truman Report" of 1944], the report would not be conclusive, or more than evidence. We could not constitutionally substitute it for the findings of a court after a trial: facts which a court may judicially 'notice' do not for that reason become indisputable. Wigmore, §2567a."

The second specification charged against the appellant by the Committee's complaint accused him of "acting as a party functionary in connection with the activities of the Communist Party in the City of Pittsburgh, Pennsylvania, and in that capacity assisting in the formulation and the carrying out of party policies, especially with reference to the organization and control of basic industries in the Pittsburgh district." The Subcommittee made no finding with reference to the organization and control of basic industries in the Pittsburgh district. That portion of the specification can, therefore, be disregarded.

The Subcommittee made a finding that the appellant was a Communist Party functionary and that he "took an active part in formulating and carrying out Communist Party policies, including, inter alia, the formation of the Civil Rights Congress . . ." This finding was based, as already indicated, on Cvetic's personal definition as to what constituted a party functionary and his opinion that his definition embraced the appellant because, as Cvetic related, he was a member of the Legal Commission of the Communist Party. Even taken at face value, Cvetic's testimony that appellant was a member of the Legal Commission of the Communist Party and that he took an active part in the formation of the Civil Rights Congress would not war-

rant a finding that the appellant was guilty of unprofessional conduct. While Cvetic was at pains to speak derogatorily of the appellant for providing legal representation of the Communist Party and various individual Communists, the fact remains that the Party is entitled to legal representation the same as any other organization; and a member of the bar not only has a legal right but, when called upon, a duty to defend unpopular, as well as popular, causes and groups. Indeed, it is the unpopular cause which most needs legal aid and representation.

In *Yates v. United States,* 354 U.S. 298, 330 (1957), in reversing the convictions of fourteen persons under the Smith Act, the Supreme Court said that "the sole evidence as to them [i.e., five of the fourteen] was that they had long been members, officers or functionaries of the Communist Party of California; and that standing alone . . . makes out no case against them. So far as this record shows, none of them has engaged in or been associated with any but what appear to have been wholly lawful activities . . ."

. The *Nowak* and *Maisenberg* cases, supra, hold that proof that a person is an active member and functionary of the Communist Party does not justify a finding that such person is not attached to the principles of the United States Constitution. The *Yates* case, supra, holds that proof of Communist Party activity as a member and functionary does not justify a finding that such person has engaged in or been associated with any unlawful activities. Certainly, therefore, such proofs will not justify a finding that a member of the bar is guilty of professional misconduct by being a member and functionary of the Communist Party when such activity was limited to a time during which the party was a legally recognized political party of the State. And, this is particularly so when the attorney's activity and functioning within the Communist Party

is shown to be connected with his legal representation of the Party and its members.

The third and final specification alleged by the Committee in support of the charge against the appellant accused him of "actively advocating and supporting the aforesaid aim and purpose of the Communist Party to overthrow the Government of the United States by force and violence in derogation and in violation of the oath taken by Respondent upon his becoming a member of the bar of the Court of Common Pleas of Allegheny County, Pennsylvania." The Subcommittee made no findings of fact relating to this charge. It concluded, however, as a matter of law, that appellant's presumed advocacy and support of the overthrow of the United States Government by force and violence "necessarily follows from his membership in and active support of the Communist Party over a prolonged period of time as disclosed by the evidence."

Advocacy and support of the overthrow of the government by force and violence must be proven; they cannot be presumed merely from Communist Party affiliation. See, e.g., *Nowak v. United States,* supra, pp. 666-668; *Maisenberg v. United States,* supra, p. 673; *Schneiderman v. United States,* supra, p. 136; *Noto v. United States,* 367 U.S. 290 (1961). Thus, the United States Supreme Court has held, on numerous occasions, that advocacy and support of the overthrow of the government by force and violence cannot legally be inferred from one's being a member and functionary of the Communist Party. A fortiori, it could not "necessarily follow" therefrom, as the Subcommittee mistakenly concluded it did.

Moreover, to be culpable, such advocacy must be by no less than advocacy to forcible and violent action and not merely the advocacy of abstract doctrine. In *Yates v. United States,* supra, the Supreme Court pointed out (pp. 318, 324-325) that "The distinction between advo-

cacy of abstract doctrine and advocacy directed at promoting unlawful action is one that has been consistently recognized in the opinions of this Court, beginning with Fox v. Washington, 236 U.S. 273, and Schenck v. United States, 249 U.S. 47. . . . The essential distinction is that those to whom the advocacy is addressed must be urged to *do* something, now or in the future, rather than merely to *believe* in something." The vitality of the decision in the *Yates* case was recently reaffirmed in the *Noto* case, supra, where Mr. Justice HARLAN, speaking for the Supreme Court, in unmistakable language, said (pp. 297-8), "We held in *Yates*, and we reiterate now, that the mere abstract teaching of Communist theory, including the teaching of the moral propriety or even moral necessity for a resort to force and violence is not the same as preparing a group for violent action and steeling it to such action. There must be some substantial direct or circumstantial evidence of a call to violence now or in the future which is both sufficiently strong and sufficiently pervasive to lend color to the otherwise ambiguous theoretical material regarding Communist Party teaching, and to justify the inference that such a call to violence may fairly be imputed to the Party as a whole, and not merely to some narrow segment of it."

Virtually the only testimony at the hearings having any bearing upon the appellant's state of mind related to the following statement ascribed to him by the witness Cvetic: " 'Comrades, while we have a large Communist Party in New York, I don't see how we can wage a successful revolution in the United States unless we build the Communist Party in Pittsburgh where we have the basic industries.' " This statement obviously was no more than an expression of opinion or prediction of future events and cannot, by any stretch of imagination, be tortured to mean an exhortation to use force and violence for the overthrow of the government.

Here, as in the *Nowak* case, supra, at no point does the record show that the appellant himself ever advocated forcible and violent action for the overthrow of the government or that he understood that the party advocated such action to that end. The statement attributed by Cvetic to the appellant concerning what was necessary to "wage a successful revolution in the United States" was a very mild expression of opinion when compared with the statements attributed to Nowak by the three witnesses who testified against him (see 356 U.S., p. 666), as to which the Supreme Court said, perforce, "Read in context, they can be taken as merely the expression of opinions or predictions about future events, rather than as advocacy of violent action for the overthrow of government."

There is not a word in this record that the appellant ever advocated the overthrow of the government by the use of force and violence. Is it not remarkably strange, if he had ever been guilty of such conduct, that, at some time during the lengthy disbarment proceeding (it spanned a decade from beginning to end) there was no one to come forward to say that appellant was once heard to advocate the overthrow of the government by force and violence.

We come now to consider the further error assigned in connection with the Subcommittee's rulings at the hearing on the appellant's offers of proof and requests in procedural relation.

The Subcommittee's refusal of the appellant's offer of proof concerning the aims and purposes of the Communist Party and the deprivation of due process which the Subcommittee's ruling entailed has already been discussed in another connection and nothing further need be said about it here.

While the Subcommittee did permit appellant to cross-examine the witness Cvetic, to a limited extent, it refused to allow the witness to be interrogated with

respect to certain specified matters which would have directly searched the depth of Cvetic's bias, interest and prejudice. Common and ordinary fairness should have prompted the widest latitude in appellant's cross-examination of Cvetic, whose openly avowed hostility toward appellant was intense. On one occasion a few months before Cvetic testified in these proceedings, he had invaded the appellant's home township where he proclaimed in a public address that he would do everything in his power to see that the appellant was disbarred.

It was also during the pendency of these proceedings that Cvetic, while counseled, if not abetted, by one Harry Alan Sherman, a member of the local bar, instituted, as *private prosecutor,* criminal proceedings against the appellant before a justice of the peace charging him with sedition in violation of a Pennsylvania statute. Reference has already been made in our statement of the facts to this criminal proceeding which the Court of Quarter Sessions of Allegheny County, acting by a court en banc composed of three judges, unanimously quashed as violative of the appellant's constitutional safeguards and statutory rights.[2]

---

[2] The facts attending, and incident to, the criminal proceeding, as unanimously found by the Court of Quarter Sessions of Allegheny County, disclose a deplorable and reprehensible situation in connection with the shocking and flagrantly outrageous treatment to which the appellant was subjected. About 3:45 p.m. on June 11, 1951, while at a bus station in downtown Pittsburgh, on his way home for the day, the appellant was arrested by a contable on a warrant issued by the justice of the peace on Cvetic's sedition information against him. The warrant specifically provided, contrary to the provisions of the Pennsylvania Constitution, that there was to be no bail. The arresting officer handcuffed the appellant and placed him in an automobile in which he was driven around the town and through an outlying district for three hours until newspaper photographers had gathered at the county jail, where they took pictures of the appellant being delivered to the jail; a photograph, so showing, appeared in the public press the next day.

During the cross-examination of Cvetic, the appellant asked for and was granted a subpoena to Harry Alan Sherman, Cvetic's legal representative in the criminal proceeding against appellant before the justice of the peace. The appellant called Sherman for the purpose of showing that a transcript of the proceedings before the justice of the peace had been suppressed by Sherman and that thereby appellant was severely limited in his cross-examination of Cvetic because of the unavailability of the transcript. Sherman admitted that a stenographer made a complete transcript of the proceedings before the justice of the peace, and that he had directed her not to deliver a copy of it to appellant or his attorney. After saying that he had taken the original notes, he qualified by saying that he couldn't remember that he had but that it was possible.

Even though the testimony of the Committee's witnesses is manifestly insufficient to support a conclusion that the appellant was guilty of professional misconduct, what discrediting effect the testimony offered by the appellant, which the Subcommittee ruled out, would have had, can only be imagined.

The appellant offered to produce the records of the Pittsburgh office of the Communist Party which were impounded in the Court of Quarter Sessions of Allegheny County, having been seized in October of 1950 in

---

While in jail the appellant was held without bail, was assaulted by a guard, and was lodged in a narrow dark cell in the cellar. He was refused permission to call his counsel or his wife to explain what had become of him. Finally, he was permitted to *telegraph* his counsel, who contacted the President Judge of the Court of Common Pleas by telephone. The latter forthwith telephoned the warden of the jail and ordered him to release the appellant on his own recognizance, which was done at 1:10 a.m., June 12th. For the complete findings, conclusions and order of the Court of Quarter Sessions of Allegheny County upon quashing the criminal proceeding instituted against Schlesinger by Cvetic, as advised by his attorney, Sherman, see 24 Pa. D. & C. 2d 758 (1951).

connection with another proceeding. These records covered the years during which the appellant, according to Cvetic, had belonged to the Communist Party in Pittsburgh and were, of course, relevant and material to the truth or falsity of that accusation. The offer was rejected by the Subcommittee and the evidence excluded.

The Subcommittee denied the appellant's request that it issue a subpoena directed to the F.B.I. to produce the recordings made by the F.B.I. of the meetings at 440 Wood Street, Pittsburgh, as to the making whereof the Committee's witness Dietze had testified. This evidence was proffered to contradict the statements of Dietze, Mazzei and Cvetic, and to show that appellant had never attended or participated in any meetings on the premises described. The Subcommittee also denied the appellant's similar request that it issue a subpoena directed to the F.B.I. to produce the reports which the Committee's witnesses Dietze, Mazzei and Cvetic testified that they had submitted to the F.B.I. covering the matters to which they had testified at the hearing. This proposed evidence was for the purpose of contradicting statements made by these witnesses at the hearing. The appellant was entitled to the requested evidence in both particulars on the basis of the decision of the Supreme Court in *Jencks v. United States,* 353 U.S. 657 (1957).

In disposing of the exceptions to the report and recommendation of the Subcommittee the court en banc held the *Jencks* case to be inapplicable on the ground that it was "a criminal prosecution and relates to the procedural requirements for Federal prosecution of crime by providing for requirement of fair procedure for the defendant." The distinction is without merit. In the *Jencks* case the defendant was charged with perjury for falsely swearing in a non-Communist affidavit which he filed with the National Labor Relations Board. The principal witnesses against him were two

informers, Ford and Matusow, hired by the F.B.I. They testified that they had sent reports to the F.B.I. concerning matters to which they were testifying at trial. The trial court refused the defendant's motion to direct the F.B.I. to produce these reports for inspection.. The Supreme Court reversed the defendant's conviction, declaring (pp. 668-669) that "the petitioner was entitled to an order directing the Government to produce for inspection all reports of Matusow and Ford in its possession, written and, when orally made, as recorded by the F.B.I., touching the events and activities as to which they testified at the trial. . . . Justice requires no less." The Supreme Court further held (page 666) that "the petitioner was not required to lay a preliminary foundation of inconsistency, because a sufficient foundation was established by the testimony of Matusow and Ford that their reports were of the events and activities related in their testimony."

The present appellant is just as much entitled to fair procedure as was the defendant in the *Jencks* case. A disbarment proceeding is every bit as serious as a criminal trial and often far more so; the penalty of disbarment is certainly harsher than a fine or short imprisonment. Nor is the rule of the *Jencks* case peculiar to federal criminal prosecutions; it is a requirement of due process of law. The appellant has a constitutional right to the production of the reports of the witnesses against him, touching the events and activities to which they testified, and to inspect so much of such reports as is relevant to the issue. Justice required no less in the *Jencks* case, and it requires no less in the instant case.

The appellant was prejudiced by the Subcommittee's refusal to permit him to interrogate Cvetic (who had indicated that he intended to submit a bill) as to how much money he expected to be paid for testifying against him and by the Subcommittee's refusal of appellant's offer to show that Cvetic's sole source of in-

come since 1950 had been derived from various anti-Communist activities such as testifying against the appellant. The appellant was also prejudiced by the Subcommittee's refusal to permit him to interrogate, in similar relation, the witness Sherman concerning a contract between him and Cvetic whereby Sherman was to receive a percentage of Cvetic's income from all of his anti-Communist activities. The purpose of this testimony was to show the motive, bias and interest of Cvetic, as well as of the witness Sherman.

The appellant was denied the right by the Subcommittee of introducing testimony to show that Cvetic was a chronic alcoholic and that he had recently been committed to the Psychiatric Division of St. Francis' Hospital in Pittsburgh for treatment. This evidence was offered for the purpose of impeaching the memory, mental competency and credibility of Cvetic, and it was error for the Subcommittee to reject this offer of proof.

The appellant was further prejudiced by the Subcommittee's refusal of appellant's offer to take and produce the deposition of Pete Martin, who wrote an article for publication in The Saturday Evening Post entitled "I was a Communist for the F.B.I." which was based upon statements made to Martin by Cvetic. This evidence was relevant and material for the purpose of contradicting statements made by Cvetic at the hearing, and the Subcommittee's rejection of this offer was likewise error.

In its report, the Subcommittee opened that the appellant "by invoking the Fifth Amendment . . . failed to exhibit the forthrightness and candor that the Court of Common Pleas of Allegheny County, Pennsylvania has the right to expect from an officer of that Court and such action constitutes a factor that may be taken into account by the Court in whatever disciplinary action the Court may decide." It was error, in the circumstances, for the Subcommittee, as trial tribunal, to take

such a factor into account in its report and recommendation. The appellant was never charged with improperly invoking the Fifth Amendment, nor was he ever notified or apprised that his refusal to answer the questions of the Committee would be considered a ground for his disbarment. Nor is there anything in the record which would indicate that his position was not taken in good faith. Indeed, the record shows ample and reasonable grounds for invoking the privilege. When the appellant, at the hearing before the Subcommittee, was interrogating Harry Alan Sherman, who had represented Cvetic as private prosecutor in Cvetic's criminal proceeding against the appellant, with such tragic consequences to the appellant, Sherman's declaration that if appellant denied certain statements he would be guilty of perjury was a sufficient threat to justify the appellant in pleading his privilege, if further harassment was to be avoided. In *Slochower v. Board of Education,* 350 U.S. 551, 557 (1956), the Supreme Court stated that "we must condemn the practice of imputing a sinister meaning to the exercise of a person's constitutional right under the Fifth Amendment. . . . As we pointed out in [*Ullmann v. United States,* 350 U.S. 422], *a witness may have a reasonable fear of prosecution and yet be innocent of any wrongdoing."* (Emphasis supplied.)

The court below attempted to extenuate the obviously unjust inferences drawn by the Subcommittee from the appellant's reliance upon the First and Fifth Amendments to the Constitution by saying, "We believe here the Committee was referring to the uncontradicted testimony of the witnesses and the state of the record; without any such contradicting evidence and not to any odious or unlawful inference that may be drawn or resolved against the Respondent by his invocation of the First Amendment. The invocation of his constitutional right did not abrogate the testimony

presented by witnesses against him. We do not understand that the Committee is drawing any inference from the use of a legally invested right under the constitution . . ." In short, the court below excluded the appellant's plea of the First and Fifth Amendments as a ground for its order of disbarment.

In summary, the Subcommittee concluded, as a matter of law, that the appellant "has been guilty of professional misconduct in that he has violated the oath administered to him at the time of his admission to the Bar." It did not explain in what manner or in what particular it deemed he had done so. It made no findings of fact relating thereto. This conclusion must rest upon the assumption that the alleged violation necessarily follows from the Subcommittee's findings that the appellant was a member and functionary of the Communist Party. However, as we have seen, the United States Supreme Court has held that such findings will not justify an inference that a person is not of good moral character, or is not attached to the tenets of the United States Constitution; nor will it justify an inference that he advocates the forcible and violent overthrow of the government, or that he has engaged in or been associated with any unlawful activity. This conclusion of law made by the Subcommittee and adopted by the court below is manifestly erroneous.

The order of the court below disbarring the appellant violated the requirements of both procedural and substantive due process of law under the Fourteenth Amendment to the Constitution of the United States as well as the Constitution of the Commonwealth.

The order of disbarment is reversed and the record remanded with directions that the complaint be dismissed.

Mr. Justice MUSMANNO did not participate in the decision in this case.

CONCURRING OPINION BY MR. JUSTICE BENJAMIN R. JONES:

While I join in the reversal reached by the opinion written for the majority of this Court by our Chief Justice, I desire to state my reason therefor.

The Committee on Offenses of the Court of Common Pleas of Allegheny County is a body of fifteen members of the Bar appointed by that Court and the President of the Allegheny County Bar Association. On May 26, 1950, that Committee, *by a majority vote of its entire membership,* decided to bring charges of professional misconduct against Schlesinger. No complaint had been filed against Schlesinger by any person other than the Committee. The Committee not only preferred the charges against Schlesinger and filed a written complaint upon him but it appointed its own counsel to prosecute the charges. The Committee then referred the proceeding for hearing and report to a sub-committee which consisted of three of the members of the same Committee which had initiated the charges. The Committee, in the role of prosecutor, examined and paid the witnesses against Schlesinger, sought to limit Schlesinger's cross-examination of its own witnesses and the scope of Schlesinger's rebuttal and impeachment evidence and vigorously prosecuted the charges against Schlesinger. Acting through the sub-committee and in a judicial capacity, the Committee presided over the hearing on the charges which it had initiated, determined the burden of proof which the prosecution had to meet, ruled on matters of evidence, and, finally, determined the law applicable to the evidence adduced. In its capacity as a jury, the Committee passed upon the credibility of not only Schlesinger's but its own witnesses, determined the inferences to be drawn from such testimony and determined the facts established by the evidence.

Such a situation, in my opinion, does not constitute constitutional due process. This Committee, even though acting with the best of intentions, could not sit in the triple capacity of prosecutor, judge and jury. In *Blenko v. Schmeltz*, 362 Pa. 365, 67 A. 2d 99, we enjoined the conduct of a hearing under just such circumstances, stating, inter alia: "It appears clear to us that the defendant board, in violation of elementary principles, was acting as prosecutor and trial tribunal at the same time." (p. 374)

It is repugnant to my sense of justice to permit a tribunal which by a majority vote of its members has levied a charge to sit in judgment upon such charge. In *In Re Murchison*, 349 U.S. 133, the United States Supreme Court said: "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome."

In my opinion, constitutional due process was lacking in this proceeding and, for that reason, I am compelled to vote for reversal of this disbarment.

---

CONCURRING OPINION BY MR. JUSTICE EAGEN:

I join in the thoughts and conclusions reached by Mr. Justice Benjamin R. Jones, as expressed in his opinion filed in this case. By the same token if due process were present I would unhesitatingly vote to affirm the order of disbarment.

An individual, who is given the priceless privilege of practicing law, is duty bound to uphold and defend the Constitution of the United States of America. This is

the minimum that might be expected of one so highly favored. If established facts tend to indicate that he has forsaken that oath, the least he should do is to answer, if called upon to explain his conduct by the Courts or a proper investigating tribunal. His refusal to do so in my opinion, is sufficient to warrant the conclusion that he is the type of person unworthy of being a member of the legal profession.

In very recent decisions, the Supreme Court of the United States affirmed the action of two state courts refusing to admit an applicant for admission to the Bar on the ground that he had obstructed the Committee of Bar Examiners in the performance of its duty in refusing to answer questions of a similar nature which this present issue involves. See *Konigsberg v. State Bar of California,* 366 U.S. 36 (1961); *In re George Anastaplo,* 366 U.S. 82 (1961). If an individual is unworthy to gain admission to the profession by such refusal certainly one who has enjoyed the fruits of the privilege for many years is at the very least unworthy to continue in the profession.

---

DISSENTING OPINION BY MR. JUSTICE BELL:

The majority Opinion is based upon six important points—(1) the witnesses were unworthy of belief; (2) the evidence was insufficient to prove the charges made against Schlesinger; (3) the jury was not impartial and consequently Schlesinger was deprived of the fundamentals of a fair trial and therefore of due process; (4) Communism is a peaceful political theory or doctrine akin to democracy or any share-the-wealth plan; (5) it must be proved that Schlesinger personally advocated and actively engaged in activities to overthrow the Government of the United States by force and violence; and (6) evidence was admissible to prove that

the aims and objectives of the Communistic Party are peaceful.

I disagree with the first three points; with respect to the last three my views and the majority's are as far apart as the equator and the north pole. There is a great wide gulf between us which is unbridgeable and impassable. It may be thus simply delineated:

A majority of this Court, as well as other intelligent men and learned Judges appear to believe that Communism is merely a belief or idea or peaceful political theory of government and life; I am convinced that Communism is the mortal enemy of our Country, that it has organizations in the United States (and indeed in most of the world) which are completely directed, dominated and controlled by Russia and constantly plan and plot the overthrow and destruction of our Government and our free way of life by force and violence, and whenever necessary, by insurrection, revolution and war.

The fact-finders found and the fifteen member Committee on Offenses, which was composed of highly respected lawyers, and the sixteen Judges of the Court of Common Pleas of Allegheny County, believed the evidence that Schlesinger had attended over one hundred Communism Group meetings, that he paid dues to the Communist Party, that he collected dues for the Communist Party, that he was a functionary of the Communist Party, and a functioning member of the Legal Commission of the Communist Party. From the evidence the Committee correctly concluded that Schlesinger was and is "a member of the Communist Party, one of the major aims and purposes of which Party is the overthrow of the Government of the United States by force and violence."

Schlesinger did not deny the evidence or the charges and he refused to take the witness stand and testify in his own defense! He never once denied the testimony

which was presented against him and never once denied that he was a Communist or testified that he was not a Communist. What happens to his oath that he will support the Constitution of the United States and of this Commonwealth and act with all due fidelity to the Court? The Committee drew no inference from his refusal to testify—to me the inference of his membership in and guilt of the charges of Communism is inescapable. Cf. *Barach's Case*, 279 Pa. 89, 123 A. 727. If proceedings had been brought to disbar him because he had burnt down a hospital and thereby killed most of its patients and he had refused to answer whether he had done so and based his refusal on his constitutional rights, would this Court say that he should be allowed to become or remain a member of the Bar? What is the difference in moral character, integrity, fitness and fidelity to the Court between being a member of an organization, one of whose major goals is to overthrow our Government by force and violence with the ensuing destruction of our nation and the death of many millions of our people and the enslavement of the remaining Americans, and being an individual who refuses to answer the Disbarment Committee's question of whether he had committed arson and murder?

The testimony and evidence against Schlesinger covered more than 800 pages and a long and carefully considered period elapsed before he was finally disbarred by the Court of Common Pleas. In my judgment all of the findings of fact, inferences and conclusions of the Committee were supported by ample evidence; they were unanimously approved by the sixteen Judges of the Court of Common Pleas of Allegheny County, and I would therefore affirm all of them.

It is very difficult to summarize 800 pages of testimony which was believed by the fact-finders, into two or three pages, but the following summary will, we believe, suffice.

Pursuant to Rule 52 of the Court of Common Pleas of Allegheny County, which is patterned after a similar rule of the Supreme Court of Pennsylvania's Rule 17 (j), the Committee on Offenses served on Schlesinger a complaint charging him with professional misconduct in that, inter alia, he violated his oath of office as an attorney by being a member of the Communist Party. The Committee appointed a subcommittee which held hearings and took testimony. Four witnesses testified in support of the complaint; the Committee relied only on the testimony given by Matthew Cvetic and George E. Dietze. Cvetic served with the FBI from the Spring of 1941 to February, 1950. During these nine years he met with Communists, dealt with them and learned the workings of their organization. After becoming a member of the Communist Party (upon orders of the FBI) he served on numerous committees of the Party, and engaged in almost every type of activity to which the Party had committed itself in the Pittsburgh area. During the period he was with the Communist Party he attended about 4000 meetings with his Communist comrades. On the subject of the objectives, the plans and the workings of the Communist Party in the United States, he was undoubtedly an exceptionally qualified and expert witness.

Cvetic first met Schlesinger in the latter's office in 1936, when Schlesinger was making arrangements to set up a branch of the Civil Rights Congress (a Communist Front organization). Cvetic testified to what happened at that meeting: "Well, Hymen Schlesinger says, we have, the Party wants us to set up this Civil Rights Congress, we have to set up a legal defense or-- ganization here to defend *our Party members* * who are (987) arrested by the FBI, who get in trouble with the law, and that we have to build a Civil Rights Congress

---

* Italics throughout, ours.

around various issues and then get as many non-Party people as we can to be sponsors of the Civil Rights Congress."

Subsequent to that first meeting, Cvetic met Schlesinger "periodically" at Schlesinger's office and at Communist meetings. "Q. Are these meetings that you have mentioned now meetings at which Mr. Schlesinger was present? A. Yes, sir. I am referring—you asked me about meetings at which he was present and I am referring to meetings which were *closed to others than members* of the Communist Party."

In response to a question put by the Committee's counsel, as to how many meetings of the Communist Party he attended with Schlesinger, Cvetic replied: "Certainly more than a hundred."

Cvetic also testified to collecting Communist Party dues from Schlesinger.

Perhaps the most revealing episode in the years of continuous contact which Cvetic had with Schlesinger occurred in 1948 or 1949, when both of them were attending a Communist Front organization conference in New York. On the day in question, Cvetic, Schlesinger and two others went to lunch together. Cvetic testified: "In the course of that luncheon we were talking about the Party in Pittsburgh and Schlesinger says, 'Comrades, while we have a large Communist Party in New York, I don't see how we can *wage a successful revolution* in the United States unless we build the Communist Party in Pittsburgh where we have the basic industries.' "

In another telling conversation with Schlesinger, Cvetic testified: "I met with Hymen Schlesinger in the office of M. Y. or Yee Steinberg, as we called him, again meetings which were called by Steve Nelson, Communist Party Organizer, called for the specific purpose, at which we were directed and instructed by Hymen Schlesinger that if we were subpoenaed by the Congres-

sional Committees or arrested by the FBI we were to refuse to answer any questions on our Communist activities on the grounds of the First and Fifth Amendments."

Cvetic recalled another specific case where Schlesinger instructed a Frank Borich, member of a Communist Croation Group: ". . . at this specific meeting Hymen Schlesinger was telling us about these instructions, the only thing we have to do is give our name and address, and Frank Borich said, 'Well, Comrade Schlesinger, I don't have to worry, the FBI or Congressional Committees don't have anything on me, they don't know I'm in the Party,' and Comrade Schlesinger said, 'Comrade Borich, *these are Party instructions. You will give them no answers whatsoever.'* "

The testimony of George Dietze was not as extensive as that of Cvetic's but it was likewise strong and convincing. Dietze was employed by the FBI for ten years. At the request of the FBI, he became a member of the Communist Party for six years, specializing in the activities of the Communist Party Tom Paine Club which, according to his testimony, consisted of the more "intelligent people" like "lawyers, professors, teachers, musicians." Dietze testified that Schlesinger attended meetings of the Tom Paine Club about fifteen times and that he participated in the meetings.

Before discussing the most important points relied upon by the majority, I shall dispose of several relatively minor ones.

We note, parenthetically, that the majority make much of the fact that during a part of the proceedings Schlesinger was not represented by counsel. Schlesinger is an experienced attorney; he had not one but six experienced lawyers representing him during the most important part of the proceedings, and there is no evidence that he could not secure a lawyer to represent

him prior thereto if he had so desired. We consider this subject merely a diversionary irrelevancy.

The majority take the position that Schlesinger was prejudicially harmed by the failure of the trial examiners and the lower Court to permit him to widely examine the witnesses. The majority Opinion says that Schlesinger should have been permitted to cross-examine Cvetic on the subject of whether he was an alcoholic. But this argument completely overlooks the all-important fact that Cvetic was on the witness stand for four days and the fact-finders thus had ample opportunity to judge his credibility and the weight to be given his testimony. They found Cvetic's testimony credible and trustworthy. In addition, there is no evidence in the record that Cvetic's testimony was affected, tainted, or remotely influenced by any suggestion of alcoholism. Moreover, the fact that one might be addicted to drink or alcoholism does not in itself indicate that he may not be as truthful, accurate, and reliable as one not so addicted. In any event, the cross-examination which Schlesinger desired dealt with collateral matters and it is hornbook law that the latitude of cross-examination is a matter of discretion for the fact-finders or lower Court, and it is clear that there was no palpable abuse of discretion in sustaining objections to certain questions propounded by Schlesinger. The same argument was made and flatly rejected in *Communist Party of the United States v. Subversive Activities Control Board,* a decision by the Supreme Court of the United States handed down on June 5, 1961.

The majority take the position that this blue ribbon jury of experienced outstanding attorneys was so partial, prejudiced and biased that Schlesinger could not have obtained a fair trial. The majority also take the position that Schlesinger was deprived of a fair trial and consequently of due process because the Committee on Offenses presented the case against him and acted as

both Judge and jury, subject, of course, to an appeal to the Court of Common Pleas. There is no merit in this contention. The Committee on Offenses acted in accordance with Rule 52 of the Court of Common Pleas of Allegheny County and in accordance with Rule 17 of the Supreme Court of Pennsylvania.

For several years Bench and Bar and public alike have been urging the Courts to obtain blue ribbon juries. This jury, composed of experienced lawyers, was a blue ribbon jury of Schlesinger's peers. If any bias existed it would favor, instead of being opposed to, Schlesinger.* One of the first things that a lawyer learns is that one side of the story may sound plausible or convincing, but if so, it is only until the other side is told. Every Judge knows this by heart, and actually sees or hears and realizes and appreciates it every day he sits in Court. In my judgment, there is no merit in this contention of appellant. Especially in large cities where Court congestion and the colossal backlog of Court cases is worrying everyone, a similar practice is indulged in by custom and indeed by necessity in divorce cases and in other cases where a Court does not personally see the witnesses or actually try the case, but the matter is referred to a master or referee or auditor, etc. Furthermore, and even more important, The Pennsylvania Labor Relations Board, and the Pennsylvania Liquor Control Board act exactly the way that the

---

* The majority Opinion states that the witnesses' compensation would be approved by the Committee and implies that the witnesses' testimony would therefore be biased. Any witness bill, such as the compensation of Cvetic, would be fixed by and/or subject to the approval of the President Judge of the Court of Common Pleas and thereafter referred to the County Commissioners for payment. I take this opportunity to state that I believe the subcommittee and the Committee on Offenses deserve a great deal of appreciation for the lengthy, onerous and thankless service they have rendered in this case.

Committee on Offenses did in the instant case. They frequently investigate a possible violator and then bring a prosecution against him and then act as prosecutor, Judge and jury. Such a proceeding or procedure has been impliedly approved by this Court about 100 times. Furthermore, *Blenko v. Schmeltz*, 362 Pa. 365, 67 A. 2d 99, which is relied upon by the majority, is not only so different on its facts as to be clearly distinguishable, but even that case recognized that in certain situations it would be proper and necessary for a Committee or Board to act as prosecutor and trial tribunal at the same time (page 374).

That brings me to the last three important points relied upon by the majority—the crux of this case. I shall consider them together since they are inter-related. I shall first state that one of the bedrocks of our system of Government is the imperative necessity of a lower Court to follow the mandate or pertinent decision of a higher Court. I will therefore always be bound by and follow any pertinent decision or mandate of the Supreme Court of the United States within its jurisdiction, even though I may disagree one trillion percent with the decision of that Court or the majority thereof. We must therefore analyze the pertinent decisions of that Court—not the earlier decisions quoted by the majority, but those which were handed down by the Court in the last few months—since if they are applicable they of course rule the instant case. The majority herein have failed to realize that these recent decisions of the Supreme Court of the United States have, in some important respects, changed the law and several prior decisions of that Court relative to Communism which are cited and relied upon by the majority opinion.

The majority opinion has overlooked the very important fact that a disbarment proceeding is not a criminal proceeding, and Schlesinger is not accused of a crime. In *Barach's Case*, 279 Pa. 89, 123 A. 727, a peti-

tion was presented asking that Barach be disbarred because of the false statements which were made in a statement of claim in trespass prepared by him in his client's suit against a railroad company. Barach was also indicted on the same facts for conspiracy with his client to defraud. Barach was acquitted of the criminal charge, but under the same evidence was disbarred from membership in the Bar. The Court pertinently said (page 95) : "The proceeding referred to was criminal, in the name of the government, and that for disbarment was of a civil nature. Rules of procedure vary in the two classes of cases, and evidence necessary to convict, and that to justify an order of suspension, are measured by different standards. In the former, the defendant was entitled to a jury trial, in the latter, it is not a matter of right: Balogh v. Jackson, 272 Pa. 482; Smith's App., 179 Pa. 14. The defendant charged with crime cannot be compelled to testify, *but the contrary is true in a case such as this*: Vaughan's Case (Cal.), 209 Pac. 353, 24 A.L.R. 858, and note. The actions and parties are essentially distinct, and as an acquittal on an indictment will not prevent the maintenance of a civil suit, based on the same facts, the judgment here rendered in the first, does not prevent the carrying on of the second: Morch v. Raubitschek, 159 Pa. 559. The purpose of the criminal prosecution was punishment, and that in the state court protection (Gottesfeld's Case, 245 Pa. 314), where the power of the court to remove an attorney is exercisable though the facts fail to show the commission of a crime (Dickens's Case, 67 Pa. 169), or leave a doubt of any criminal intent: Gates's Case, 17 W.N.C. 142."

In *Montgomery County Bar Association v. Rinalducci*, 329 Pa. 296, 197 A. 924, defendant was disbarred. He alleged a denial of due process, which was rejected. This Court approved the disbarment and the disbarment proceedings which were held under Supreme Court Rule

17 and under the inherent power of the lower Court over the matter of discipline and disbarment. The Court said (page 299) : ". . . Where and how notice is to be given, and its form, are left to the sound judgment of the court before whom the attorney practices, as is also the *form* or manner *of hearing.* No case attempts to regulate this procedure and each court is, provided some notice and an opportunity to be heard are afforded, a law unto itself in so far as admission, discipline and disbarment of lawyers are concerned. Our Constitution and the Federal Constitution do not guarantee to an attorney the right of trial by jury in disbarment or disciplinary cases: Ex Parte Wall, supra; Smith's Appeal, 179 Pa. 14, 22; Balogh v. Jackson, 272 Pa. 482; Barach's Case, 279 Pa. 89, 95; Dixon v. Minogue, 280 Pa. 128. The power to discipline its officers inheres in the court itself: Austin's Case, 5 Rawle 191; In re Davies, 93 Pa. 116; Wolfe's Disbarment, 288 Pa. 331, 334; In re Disbarment Proceedings, 321 Pa. 81; Kraus's Case, 322 Pa. 362, 366; Ex Parte Wall, supra. As stated in Childs et al. v. Smeltzer, 315 Pa. 9, 15: 'A duly admitted attorney is an officer of the court and answerable to it for dereliction of duty.' " See also, *Chernoff's Case,* 344 Pa. 527, 26 A. 2d 335.

Nevertheless, even in a criminal proceeding where the law and the proofs are far more stringent against the Government and far more favorable to the accused, every contention made by appellant and every position taken by the majority of this Court have been answered and refuted in detail in the 112 page opinion by Mr. Justice FRANKFURTER speaking for the Supreme Court in *Communist Party of the United States v. Subversive Activities Control Board,* 367 U.S. 1 (1961).

That case involved the Constitutionality of the Subversive Activities Control Act of 1950, as amended partly by the Communist Control Act of 1954. The principal questions involved the requirement of registration

by the Communist Party of the United States and the requirement that *officers* of that Party sign a registration statement, with the result that they thus incriminated themselves. The Constitutionality of the Act was sustained. The Court pertinently said: "This is a proceeding pursuant to §14(a) of the Subversive Activities Control Act of 1950 to review an order of the Subversive Activities Control Board requiring the Communist Party of the United States to register as a Communist-action organization under §7 of the Act.

". . .

"Section 2 of the Act recites legislative findings based upon evidence [exhaustively] adduced before various congressional committees. The first of these is: 'There exists a world Communist movement which, in its origins, its development, and its present practice, is a world-wide revolutionary movement whose purpose it is, by treachery, deceit, infiltration into other groups (governmental and otherwise), espionage, sabotage, terrorism, and any other means deemed necessary, to establish a Communist totalitarian dictatorship in the countries throughout the world through the medium of a world-wide Communist organization.'

". . . Subsection (6) sets forth that 'The Communist action organizations so established and utilized in various countries, acting under such control, direction, and discipline, endeavor to carry out the objectives of the world Communist movement by bringing about the overthrow of existing governments by any available means, including force if necessary, and setting up Communist totalitarian dictatorships which will be subservient to the most powerful existing Communist totalitarian dictatorship. *Although such organizations usually designate themselves as political parties, they are in fact constituent elements of the world-wide Communist movement and promote the objectives of such movement by conspiratorial and coercive tactics,* instead of through

the democratic processes of a free elective system or through the freedom-preserving means employed by a political party which operates as an agency by which people govern themselves.'

". . . Finally, in §2(15), Congress concludes that '. . . The Communist organization in the United States, pursuing its stated objectives, the recent successes of Communist methods in other countries, and the nature and control of the world Communist movement itself, *present a clear and present danger to the security of the United States* and to the existence of free American institutions, and make it necessary that Congress, in order to provide for the common defense, to preserve the sovereignty of the United States as an independent nation, and to guarantee to each State a republican form of government, enact appropriate legislation recognizing the existence of such world-wide conspiracy and designed to prevent it from accomplishing its purpose in the United States.'

". . .

"But the attributes of the world Communist movement which are detailed in the legislative findings are not in the nature of a requisite category of characteristics comprising a definition of an entity whose existence vel non must be established, by proving those characteristics, in each administrative proceeding under the Act. *Congress has itself found that that movement exists.* The legislative description of its nature is not made a subject of litigation for the purpose of ascertaining the status of a particular organization under the Act. The Attorney General need not prove, in the case of each organization against whom a petition for a registration order is filed, that the international institutions to which the organization can be shown to be related fit the picture in every precise detail set forth in §2. The only question, once an organization is found to have certain international relations, is one of statu-

tory interpretation—of identifying the statutory referent. Are the institutions involved in those relations the 'world Communist movement' to which Congress referred? We are satisfied from the Board's report that the 'world Communist movement' to which its findings related the Communist Party was the same 'world Communist movement' meant by Congress.

". . .

". . . On the basis of its detailed investigations Congress has found that there exists a world Communist movement, foreign-controlled, whose purpose it is by whatever means necessary to establish Communist totalitarian dictatorship in the countries throughout the world, and which has already succeeded in supplanting governments in other countries. Congress has found that in furthering these purposes, the foreign government controlling the world Communist movement establishes in various countries action organizations which, dominated from abroad, endeavor to bring about the overthrow of existing governments, by force if need be, and to establish totalitarian dictatorships subservient to that foreign government. And Congress has found that these action organizations employ methods of infiltration and secretive and coercive tactics; that by operating in concealment and through Communist-front organizations they are able to obtain the support of persons who would not extend such support knowing of their true nature; that a Communist network exists in the United States; and that the agents of communism have devised methods of sabotage and espionage carried out in successful evasion of existing law. The purpose of the Subversive Activities Control Act is said to be to prevent the world-wide Communist conspiracy from accomplishing its purpose in this country.

"It is not for the courts to re-examine the validity of these legislative findings and reject them. See Harisiades v. Shaughnessy, 342 U.S. 580, 590. . . .

'Security against foreign danger is one of the primitive objects of civil society,' James Madison wrote in The Federalist (No. 41). . . . 'To preserve its independence, and give security against foreign aggression and encroachment, is the highest duty of every nation, and to attain these ends nearly all other considerations are to be subordinated. It matters not in what form such aggression and encroachment come. . . .' The Chinese Exclusion Case, 130 U.S. 581, 606. See also Perez v. Brownell, 356 U.S. 44; Ex parte Quirin, 317 U.S. 1; Hines v. Davidowitz, 312 U.S. 52; United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 315-322; Mackenzie v. Hare, 239 U.S. 299, 311; Fong Yue Ting v. United States, 149 U.S. 698; Mr. Justice BRADLEY, concurring in the Legal Tender Cases, 12 Wall. 457, 554, 556.

". . .

"These considerations lead us to sustain the registration provisions of §7, as not repugnant to the First Amendment, insofar as they require Communist-action organizations to file a registration statement containing the names and addresses of its present officers and members. The requirement that persons who were officers or members at any time during the year preceding registration must be listed, see §7(d)(2), (4), is a reasonable means of assuring that the obligation to list present members and officers will not be evaded. For reasons which do not require elaboration, the requirement that a registering organization list the aliases of officers and members, see §7(d)(5), must also be sustained. Nor do we find that §7(d)(3), requiring a financial accounting, or §7(d)(6), requiring a listing of all printing presses in the possession or control of the organization or its members violate First Amendment rights.

". . .

"D. Legislative Predetermination of Adjudicative Fact. It is next asserted that the Act offends the Due Process Clause of the Fifth Amendment by predetermining legislatively facts upon which the application of the registration provisions to the Communist Party depends. . . . Congress in 1954, prior to the Board's final determination in this proceeding, enacted the Communist Control Act, 68 Stat. 775, 50 U.S.C. §841 et seq., which declares in its second section:

"'The Congress hereby finds and declares that the Communist Party of the United States, although purportedly a political party, is in fact an instrumentality of a conspiracy to overthrow the Government of the United States . . . [T]he policies and programs of the Communist Party are secretly prescribed for it by the foreign leaders of the world Communist movement . . . [I]ts role as the agency of a hostile foreign power renders its existence a clear present and continuing danger to the security of the United States. . . .' . . .

"First: We have held, supra, that the congressional findings that there exists a world Communist movement, that it is directed by the Communist dictatorship of a foreign country, and that it has certain designated objectives, inter alia, the establishment of a Communist totalitarian dictatorship throughout the world through the medium of a world-wide Communist organization, §2(1), (4), *are not open to re-examination by the Board.* We find that nothing in this violates due process."

To summarize: The Court rejected the constitutional contentions raised by the Communist Party that the Act violated the First Amendment and the Fifth Amendment, and due process, and was unconstitutionally vague.

*Konigsberg v. State Bar of California,* 366 U.S. 36 (1961), likewise in principle rules the instant case. In *Konigsberg* the Supreme Court affirmed the right of the Bar Examiners to deny admission to the Bar

to an applicant who refused to answer any questions regarding his membership in the Communist Party. This refusal was affirmed even though Konigsberg proved he had a "good moral character", reiterated unequivocally his disbelief in the violent overthrow of our Government, and stated that he had never knowingly been a member of any organization which advocated any such action. The Court in its Opinion pertinently said (page 37):

"Under California law the State Supreme Court may admit to the practice of law any applicant whose qualifications have been certified to it by the California Committee of Bar Examiners. . . . To qualify for certification an applicant must, among other things, be of 'good moral character,' . . . and no person may be certified 'who advocates the overthrow of the Government of the United States or of this State by force, violence, or other unconstitutional means. . . .' . . . The Committee is empowered and required to ascertain the qualifications of all candidates.

". . .

"Petitioner's contentions in this Court in support of reversal of the California Supreme Court's order are reducible to three propositions: (1) the State's action was inconsistent with this Court's decision in the earlier Konigsberg case; (2) assuming the Committee's inquiries into Konigsberg possible Communist Party membership were permissible, *it was unconstitutionally arbitrary for the State to deny him admission because of his refusals to answer;* and (3) in any event, Konigsberg was constitutionally justified in refusing to answer these questions.

". . .

". . . In recalling Konigsberg for further testimony, the Committee did only what this Court has consistently held that federal administrative tribunals may do on

remand after a reviewing court has set aside agency orders as unsupported by requisite findings of fact. Federal Communications Comm'n. v. Pottsville Broadcasting Co., 309 U.S. 134; Fly v. Heitmeyer, 309 U.S. 146. . . .

"*We think it clear that the Fourteenth Amendment's protection against arbitrary state action does not forbid a State from denying. admission to a bar applicant so long as he refuses to provide unprivileged answers to questions having a substantial relevance to his qualifications. . . .*

"In the context of the entire record of these proceedings, the application of the California rule in this instance cannot be said to be arbitrary or discriminatory. . . .

"*We likewise regard as untenable petitioner's contentions that the questions as to Communist Party membership were made irrelevant either by the fact that bare, innocent membership is not a ground of disqualification, or by petitioner's willingness to answer such ultimate questions* as whether he himself believed in violent overthrow or knowingly belonged to an organization advocating violent overthrow. The Committee Chairman's answer to the former contention was entirely correct: 'If you answered the question, for example, that you had been a member of the Communist Party during some period since 1951 or that you were presently a member of the Communist Party, the Committee would then be in a position to ask you what acts you engaged in to carry out the functions and purposes of that party, what the aims and purposes of the party were, to your knowledge, and questions of that type. You see by failing to answer the initial question there certainly is no basis and no opportunity for us to investigate with respect to the other matters to which the initial question might very well be considered preliminary.'

". . .

"Finally, petitioner argues that, in any event, he was privileged not to respond to questions dealing with Communist Party membership *because they unconstitutionally impinged upon rights of free speech and association protected by the Fourteenth Amendment.* *

"At the outset we reject the view that freedom of speech and association (N.A.A.C.P. v. Alabama, 357 U.S. 449, 460), as protected by the First and Fourteenth Amendments, are 'absolutes,' not only in the undoubted sense that where the constitutional protection exists it must prevail, but also in the sense that the scope of that protection must be gathered solely from a literal reading of the First Amendment.

". . .

"It would indeed be difficult to argue that a belief, firm enough to be carried over into advocacy, in the use of *illegal* means to change the form of the State or Federal Government is an unimportant consideration in determining the fitness of applicants for membership in a profession in whose hands so largely lies the safe-keeping of this country's legal and political institutions. Cf. Garner v. Board of Public Works, 341 U.S. 716. Nor is the state interest in this respect insubstantially related to the right which California claims to inquire about Communist Party membership. This Court has long since recognized the legitimacy of a statutory finding that membership in the Communist Party is not unrelated to the danger of use for such illegal ends of powers given for limited purposes. See American Communications Assn. v. Douds, 339 U.S. 382; see also Barenblatt v. United States, 360 U.S. 109, 128-129; cf. Wilkinson v. United States, 365 U.S. 399; Braden v. United States, 365 U.S. 431.

"As regards the questioning of public employees relative to Communist Party membership it has already

* Italics throughout, ours.

been held that the interest in not subjecting speech and association to the deterrence of subsequent disclosure is outweighed by the State's interest in ascertaining the fitness of the employee for the post he holds, and hence that such questioning does not infringe constitutional protections. Beilan v. Board of Public Education, 357 U.S. 399; Garner v. Board of Public Works, 341 U.S. 716. With respect to this same question of Communist Party membership, we regard *the State's interest in having lawyers who are devoted to the law in its broadest sense,* including not only its substantive provisions, but also its procedures for orderly change, *as clearly sufficient to outweigh the minimal effect upon free association occasioned by compulsory disclosure in the circumstances here presented."*

See to the same effect the companion case of *In re George Anastaplo,* 366 U.S. 82, in which the Supreme Court affirmed the Order of the Supreme Court of Illinois which *denied admission* to the Bar of an instructor and research assistant who had passed his Illinois bar examinations. This denial was based upon petitioner's refusal to answer questions of the Committee on Character and Fitness, *as to whether he was a member of the Communist Party.* The Court pertinently said (pages 85-86) : ". . . Anastaplo undertook to expound and defend, *on historical and ideological premises, his abstract belief in the 'right of revolution,'* and to resist, on grounds of asserted constitutional right and scruple, Committee questions which he deemed improper. The Committee already had before it uncontroverted evidence as to Anastaplo's 'good moral character,' in the form of written statements or affidavits furnished by persons of standing acquainted with him, and the record on rehearing contains nothing which could properly be considered as reflecting adversely upon his character or reputation or on the sincerity of the beliefs he espoused before the Committee. Anastaplo

persisted, however, in refusing to answer, among other inquiries, the Committee's questions as to his possible membership in the Communist Party or in other allegedly related organizations."

### The Real Nature and Menace of Communism

Schlesinger contends, as do virtually all Communists who are accused or caught, that Communism is merely a political belief—like the *peaceful* advocacy of socialism, or Government ownership of all railroads and utilities or of all property, or the confiscation of all incomes over $5,000, or any other share-the-wealth plan, or the abolition of Congress and the substitution of an Oligarchy or of a Dictatorship,—and consequently falls within the ambit and is protected by the Constitutional guarantee of Freedom of Speech. Fortunately for the welfare of our Country, the Supreme Court of the United States—carrying out the heartfelt wishes of the people as well as the will of State Legislatures and of Congress—has recently and flatly rejected such contentions. Commencing in 1933, when President Roosevelt recognized Communist Russia and proclaimed it to be more Democratic than our Democracy (ours is actually a Republican form of Government although our system and way of life is democratic), many of our highest public officials, many members of the State Department, many diplomats, many so-called intellectuals, and many union labor leaders, were completely fooled and bamboozled as to the real nature and meaning and the real goals and menace of Communism.* It is astonishing to me and one of the numerous things in today's world which to me is incomprehensible, that a few leading

---

* In 1935 I formed an organization to combat Communism and portray its real nature and objectives. Few will now recall the vilification with which the truth was greeted in the 1930's and early 1940's.

Americans including experienced Judges and wishful-thinking diplomats are still completely fooled as to the real nature, purposes, aims, objectives and goals of Communism. Possibly this is because of the yearning of millions of Americans for Peace at any price, and their consequent swallowing hook, line and sinker of the specious pious pleas for peaceful coexistence and other deceitful phrases and artifices employed by Russia's leaders. Communism, by its teachings, and even more *strikingly* by its acts and deeds, is the mortal enemy of our Country. The Bible teaches us "By their fruits ye shall know them". Today we sometimes express the same thought "actions speak louder than words." Applying this or any other realistic standard, it is clear as the noonday sun in summer, it is clear beyond the shadow or possibility of a doubt that Marx's Communism, as interpreted, promulgated and *practiced* by Lenin, Stalin, Khrushchev and Company, advocates, plans and constantly plots (1) to establish a Communist Dominion of the World under a despotic Russian Dictator with puppet dictators in every satellite country (allegedly by and for the proletariat); and (2) the overthrow and capture of every Government and every Country in the World by force, violence, subversion, sabotage, strikes, insurrections, revolution and, whenever necessary, war; and (3) *the Enslavement* of all peoples throughout the Globe under the tyrannical, terroristic, ruthless rule of an atheistic Communist Tyrant; and (4) the destruction of religion—all of this for the pretended benefit of (a tiny percentage of) the proletariat known as Communists, and hypocritically called "The State". You don't have to study Marx's or Lenin's* or Stalin's books to realize this. Anyone who

---

* Bishop Fulton J. Sheen, in a recent nationwide address, warned the people of the United States: "In any East-West meetings I can never forget the words of Lenin: 'Every lie, knavery, deceit and ruse must be used to further world revolution.'"

has the slightest doubt of this after Russia's rape of Latvia, Estonia, Lithuania, Poland and Czechoslovakia, and the enslavement of the Baltic peoples and the Slavs and the East Germans and other satellite nations, and Russia's merciless, treacherous destruction and butchery of Hungary's patriots, must be totally ignorant of world affairs or unbelievably naive and gullible.

As recently as April, 1961, President Kennedy pointed out the mortal danger that Communism presents to our Republican form of Government, our way of life and our very existence as a nation. The President pertinently said: "Communists, unlike the people of the western world who have grown soft from luxury and ease and governmental pampering, are *dedicated to the spread of Communism throughout the world,* and the submission of the entire world to the Communist despots.* . . . If the press is awaiting a declaration of war before it imposes the self-discipline of combat conditions then I can only say that *no war ever posed a greater threat to our security. If you are awaiting a finding of clear and present danger,* then I can only say that *the danger has never been more clear and its presence has never been more imminent.* . . . [The] character [of the Communist despots] was *stamped for all time on the bloody streets of Budapest."* This was not a political speech; this was not merely the voice of the President; this was the voice of America. These are indisputable, unshakable, undoubtable, irrefutable facts of life *in today's world.*

In spite of the charges and the testimony against him Schlesinger refused to take the witness stand or subject himself to cross-examination. The inference of his guilt is inescapable! Even more important, the

---

* These are also the publicly expressed views of J. Edgar Hoover, noted Director of the F.B.I., who knows far more about Communism in the United States of America than any other person.

642

Committee on Offenses saw and heard the witnesses. We did not; and therefore they are in a far better position than we to pass upon the credibility of the witnesses. Since there was ample (if not overwhelming), evidence, if believed, to support their findings of fact, 1 would certainly sustain their findings.

I would hold that Communism is indisputably and irrebuttably a mortal enemy of the United States, and everyone who espouses it is unworthy of becoming or remaining an attorney or entitled to being termed an officer of a Court. An accused may prove as a defense his ignorance of the real nature or the aims and menace of Communism, but evidence is *in*admissible to (attempt to) disprove the real nature or aims or objectives of Communism or to prove that it is merely a political or social or peaceful doctrine.

This is not 1934, or 1941, or even 1948 or 1950. This is July 1961. In the light of all the above mentioned facts it is astonishing and almost unbelievable that experienced lawyers would contend or learned Judges* would hold, especially in the recent light of Hungary, Tibet, Laos, Cuba, Geneva and Berlin, that Schlesinger should be permitted to prove—we note, parenthetically, by others—that Communism is merely a political belief and a judicially permitted and protected form of Freedom of Speech.** To permit such testimony is to me not only unthinkable, but would, in the light of present day knowledge, constitute a colossal travesty on Justice and jeopardize our very existence as a Nation.

For these reasons I would affirm Schlesinger's disbarment.

---

* Or learned men in any profession.

** It has not escaped us that Schlesinger appeals for the protection of the Constitution which would be instantly extirpated if Communism, which he advocates, should prevail.