Gabauer *v.* Civil Service Commission.

Argued November 3, 1972, before Judges KRAMER, ROGERS and BLATT, sitting as a panel of three.

*Robert E. Kunselman,* with him *Reed, Sohn, Reed & Kunselman,* for appellant.

*J. Frank Kelker,* with him *Kelker and Kelker,* for appellee.

OPINION PER CURIAM, December 5, 1972:

This is an appeal from an order of the Court of Common Pleas of Beaver County, dated May 16, 1972, (1) denying the appeal of John W. Gabauer, formerly Chief of Police of Rochester Borough, (2) sustaining the decision of the Civil Service Commission of the Borough, and (3) sustaining and affirming the discharge of Gabauer as Chief, on written charges filed.

Although Gabauer had a right to present whatever relevant and material testimony and evidence he so desired to the court below (Act of February 1, 1966, P. L. 1656 (1965), No. 581, 53 P.S. §46191), Gabauer, through his counsel, entered into a stipulation with counsel for the Borough (1) to waive their rights to a de novo hearing before the court below, and (2) to submit the matter to that court on the record made before the Civil Service Commission, including its "opinion and order." This stipulation was approved by the lower court. Under such circumstances our scope of review is to determine whether the *Commission* abused its discretion or committed an error of law. *See Shannon v. Civil Service Commission,* 4 Pa. Commonwealth Ct. 492, 287 A. 2d 858 (1972).

We have carefully reviewed the entire record in this case and conclude that we must affirm the court below based upon the thorough opinion of President Judge JOHN N. SAWYER, which is made a part hereof by reference thereto and set forth below in its entirety:

"SAWYER, P. J.

Appellant, the Police Chief of the Borough of Rochester, has appealed to this Court from his removal

and discharge ordered by the Borough Council and affirmed by the Civil Service Commission of the Borough. By stipulation of counsel for the parties, any hearing of further testimony before the court was waived, and it was agreed that the matter should be considered by the court on the record made before the Civil Service Commission and the Opinion and Order of the Commission. Arguments were held and briefs submitted. The matter is now before us for disposition.

"Appellant filed his appeal pursuant to Sec. 1191 of The Borough Code of February 1, 1966, P. L. (1965) 1656, No. 581, Sec. 1191, 53 P.S. Sec. 46191, which provides, in part, as follows: 'All parties concerned shall have immediate right of appeal to the court of common pleas of the county, and the case shall there be determined as the court deems proper.'

"The Supreme Court of Pennsylvania in Baker Case, 409 Pa. 143 (1962) discussed the function of the trial court on appeal from a decision of the Civil Service Commission of the City of Pittsburgh at page 147 as follows: 'Under the scheme established by the civil service acts, primary responsibility and decision as to the methods necessary to uphold police morale and efficiency and to maintain public confidence in the police department resides in the municipal officials. See Caldwell vs. Fairley, 363 Pa. 213, 69 A. 2d 135 (1949) and Thomas vs. Connell, 264 Pa. 242, 107 A. 691 (1919). The function of the courts is merely to make sure that just cause for dismissal exists, both factually and legally, and that the municipal officials have not abused their discretion in imposing the punishment in question. It is not our function to decide what we would have done under the circumstances if we had been Baker's superiors.' Also see Ditko Appeal, 5 D. & C. 2d 569 (1955), affirmed per curiam 385 Pa. 435 (1956).

"The test announced in Baker, supra, also is applicable to an appeal under the Borough Code. Norris

v. Pottstown Borough Council, 85 Mont. Co. L. Reporter 346 (1965) ; Dougherty v. Civil Service Commission of Borough of Phoenixville, 35 D. & C. 2d 115 (1964).

"Thus, this court must determine whether the evidence establishes both factually and legally that just cause exists for appellant's discharge and that the Commission did not abuse its discretion in sustaining the action of the Borough Council.

"The stated reasons of the Borough Council for discharging Chief Gabauer were as follows:

1. He failed to exercise proper leadership in the Police Department.

2. He has been inefficient in the prosecution of the duties of his office with the result that the police force reflects his attitude of general indifference.

3. At numerous times he has become intemperate and disorderly in various taverns in the Borough of Rochester and other communities necessitating his being removed from the premises by the police on occasions.

4. On January 13, 1970 in Didio's Restaurant in Rochester he became drunk and boisterous insulting a female patron and fighting with her husband when he defended her. The police were called and he was subdued by force.

5. On July 21, 1970 at about 4:00 a.m. he allegedly made indecent advances on the person of Ernest Miller and against his will and consent; that said Ernest Miller resisted these advances with force.

6. He has damaged the image of the Police Force of the Borough of Rochester and by his conduct has lost the respect of the citizens of the Borough of Rochester.

7. For general conduct unbecoming an officer.

"After full hearings on the matter held on the evenings of February 2 and 3, 1971, the following findings of fact were made by the Commission:

1. John W. Gabauer was the duly appointed Chief of Police of the Borough of Rochester on July 2, 1970 (Rec. 134).

2. On January 13, 1970, at Didios Restaurant, John W. Gabauer used extremely foul language and insulted a woman patron. Following an exchange with her husband, he assaulted the husband (Rec. 199).

3. Although not on duty at the time, Chief Gabauer was subsequently suspended for five days because of the incident at Didios (Rec. 152).

4. At the time of the Didio incident Chief Gabauer had been drinking (Rec. 103).

5. A serious disturbance occurred at the Beaver-Rochester football game in November, 1969. The disturbance carried into the Borough of Rochester and Chief Gabauer indicated indifference to the rather explosive situation by going hunting the following day (Rec. 34, 35, 163, 164).

6. From 9:00 o'clock P.M., July 20, 1970, to 3:00 o'clock A.M. on July 21, 1970, Chief Gabauer consumed fifteen (15) bottles of beer at Municipal Grill (Rec. 135, 184).

7. About 3:00 o'clock A.M. on July 21, 1970, Chief Gabauer agreed to drive Gerald Goff and Ernest C. Miller home (Rec. 140).

8. Shortly thereafter Chief Gabauer went to the Men's Room where Miller approached him and grabbed his penis (Rec. 14).

9. Despite the strong indication of homosexuality displayed by Miller, Chief Gabauer proceeded to drive Miller and Goff home (Rec. 142).

10. Chief Gabauer drove to a quiet spot and parked there with Miller in the front seat. At this point Miller apparently feared a trap and ran away (Rec. 144).

11. Chief Gabauer failed or refused to state clearly what his intentions were with respect to Miller.

12. Approximately five (5) years prior to the hearing Chief Gabauer was involved in an altercation at Hollywood Gardens which required that Policemen be called to the premises (Rec. 179).

13. Apparently the incident was not reported on the police records (Rec. 179).

14. On another occasion Chief Gabauer was involved in an incident at Freddies Bar. He was injured sufficiently that he had to go to the hospital and have stitches put in. (Rec. 176-177).

15. On the night following the Miller incident, Chief Gabauer was interrogated by the Public Safety Committee of Council. At that time he denied any incident, denied that he knew Miller and denied that Miller was in his car (Rec. 164).

16. Chief Gabauer was an experienced police officer and had been Chief for a period of eight (8) years (Rec. 165, 132, 122).

17. Proper notice of the charges made against Chief Gabauer was given to him by the Borough of Rochester.

"There is competent evidence which supports the findings of the Commission.

"The Commission reached three specific conclusions respecting the conduct of Chief Gabauer as follows:

1. John W. Gabauer was guilty of intemperate and disorderly conduct in public while he was Chief of Police.

2. The conduct of Chief Gabauer has damaged the image of the Rochester Police.

3. John W. Gabauer was guilty of conduct unbecoming a public officer on a number of occasions.

"We are of the opinion that these conclusions are supported by the evidence and the findings of fact.

"Appellant contends that Chief Gabauer's intemperate and disorderly conduct at Didio's Restaurant on

January 13, 1970, should not be considered in proving the charges against Chief Gabauer since he was subsequently suspended for five days because of that incident. However, without taking into consideration the incident of January 13, 1970, the evidence is that the Chief frequented Didio's Bar two or three times a week; and, on those occasions, he would be drinking and at times he would become boisterous, loudmouthed and foulmouthed (Rec. 113). Several years ago, at the Hollywood Gardens, the Rochester Police were called out because of a disturbance caused by Chief Gabauer (Rec. 174). While off duty, the Chief was also involved in an incident at Freddies Bar, as a result of which he had to be taken to the hospital for first aid. At the Commission hearing, the chairman questioned Chief Gabauer concerning 'all of the scrapes you have been in,' and asked the Chief, 'Do you think that's a bad example?' And the Chief replied, 'yes.'

"On the night of the Miller incident, the Chief from nine o'clock p.m. to three o'clock a.m. consumed fifteen bottles of beer at the Municipal Grill, a public bar in the Borough. There is ample evidence in the record to support the finding and the conclusion of the Commission that the Chief was guilty of intemperate and disorderly conduct in public. This conduct damaged the image of Rochester Police and was conduct unbecoming a police chief. In addition, the conduct of Chief Gabauer, arising out of the Miller incident, damaged the image of the Rochester Police and was conduct unbecoming a chief of police. According to the Chief's own testimony, Mr. Miller made certain indecent advances to him at the Bar and in the men's room of the Municipal Grill, indicating he was a homosexual; and subsequently the chief drove Mr. Miller to an isolated quiet spot on his own property and parked there with him in the front seat of his car. Miller then jumped

out of the car and ran away and within an hour's time filed a complaint against the Chief, charging indecent assault. On the night following this incident, Chief Gabauer was questioned by the Public Safety Committee of Council and by the Mayor. At that time the Chief denied that there was any incident, he further denied that he knew Miller, and he denied that Miller was in his car. This was not just the case of the Chief denying the charge made by Miller; the Chief went much further than this and deliberately lied to his superiors when he stated that he had not seen Miller and had not had Miller in the car with him that night. Whether Gabauer made indecent advances to Miller or whether Miller made indecent advances to Gabauer was never resolved by Council or by the Commission. However, the facts of this case are such that it is clear that, within a few days after this incident, investigation revealed that the Chief had seen Miller that night and had Miller in his car with him. Mr. Hogue, a part-time policeman of the Borough, was a bartender on the evening in question at the Municipal Grill and he observed the Chief and Mr. Miller and Mr. Goff talking together. The Chief left with Miller and Goff in his car and dropped Mr. Goff off at his home while Miller remained in the Chief's car, so Mr. Goff was well aware that the Chief was with Miller that night.

"On the morning of the incident, Mr. Miller made a written statement of the matter. Within a few days after that, Mr. Miller was again questioned in detail by Mayor Camp, by Mr. Murray and Mr. Pfiefer, [sic] members of Council and of the Public Safety Committee. Sergeant Sciaretta received the complaint from Mr. Miller when it was first phoned in, and he later talked with Miller about the case. Shortly after the incident, Assistant Chief Beighey also talked to Miller concerning the details of the case.

"The charges of Miller against the Chief were not only known to members of Council and to the officers of the Police Force but these charges were apparently known throughout the Police Force. Mr. Hogue, the part-time policeman, stated that within a few days after the incident he had heard about the charges. Personal investigation by the Mayor revealed to him that it was quite apparent that the Chief did not tell the truth at the Public Safety Committee meeting (R. 81). The Mayor subsequently suspended him. When Council met on September 8, 1970, about seven weeks after the incident, to consider the suspension made by the Mayor, Gabauer had failed to state what his intentions were with respect to Miller; and, under the circumstances of the case, Council must also have been informed by the Mayor that Gabauer's positive statement to the Mayor and to the Public Safety Committee that he had not been with Miller was a complete falsehood. In stating its reasons for discharging the Chief, Council included the unanswered allegations of Miller. Chief Gabauer's failure to give any explanation to the matter and, in addition, his false statement with respect to not being with Miller were sufficient grounds to completely undermine the confidence of Council in the integrity of the Chief and was of itself justification for his discharge. The Chief's actions with respect to the Miller incident, along with his long-time pattern of intemperate and disorderly conduct in public while off duty, constituted ample grounds for Council's finding of general conduct unbecoming an officer and Council's finding that the Chief had damaged the image of the Police Force; and that, by his conduct, he had lost the respect of the citizens of the Borough.

"The Borough Council has the power to dismiss a police chief subject to the Civil Service provisions of the Borough Code. Borough Code, 1966, Feb. 1, P. L.

(1965) No. 581, Sec. 1121; 53 P.S. 46121. Chief Gabauer's conduct falls within the enumerated causes for dismissal provided by the Civil Service provisions of the Borough Code. These provisions in pertinent part are as follows: 'No person employed in any police or fire force of any borough shall be suspended, removed or reduced in rank except for the following reasons: . . . (4) Inefficiency, neglect, intemperance, immorality, disobedience of orders, or conduct unbecoming an officer.' (Emphasis ours) (Borough Code, 1966, Feb. 1, P. L. (1965) No. 581, Sec. 1190; 53 P.S. 46190) Intemperance means a lack of temperance not only in drinking of alcoholic beverages but also in personal demeanor and conduct. The evidence that the Chief caused disturbances at Hollywood Gardens, Freddies Bar, and during his off-duty drinking sessions two or three times a week at Didio's Bar he was often boisterous, profane and foulmouthed, and the six-hour drinking session at the Municipal Grill on July 20, 1970, constitute ample evidence of intemperance and also evidence of conduct unbecoming an officer, particularly the chief of police. The evidence of the Chief's refusal to explain his involvement in the serious charges in the Miller matter and his deliberate falsehood to his superiors, denying his presence with Miller, also constitutes conduct unbecoming an officer, particularly a police chief.

"Conduct unbecoming an officer was defined by the Pennsylvania Supreme Court in the case of In re: Zeber Appeal, 398 Pa. 35 (1959), at page 43 as follows: 'Unbecoming conduct on the part of a municipal employee, especially a policeman or fireman, is any conduct which adversely affects the morale or efficiency of the bureau to which he is assigned. It is indispensable to good government that a certain amount of discipline be maintained in the public service. Unbe-

coming conduct is also any conduct which has a tendency to destroy public respect for municipal employees and confidence in the operation of municipal services. It is not necessary that the alleged conduct be criminal in character nor that it be proved beyond a reasonable doubt. . . . *It is sufficient that the complained of conduct and its attending circumstances be such as to offend publicly accepted standards of decency.* There was clearly sufficient evidence in the record for the Trial Board, the Commission, and then the court below to determine that appellant's conduct fell below these standards. We find no abuse of discretion in dismissing appellant from his job.' (Emphasis ours)

"For the purpose of determining the appropriate punishment for the Chief, it is proper to consider the entire record of the Chief, including the incident on January 13, 1970, in Didio's Restaurant when he used foul language and insulted a woman patron and assaulted her husband, for which he received a five-day suspension. Dougherty v. Civil Service Commission of the Borough of Phoenixville, 35 D. & C. 2d 115 (1964). We are of the opinion that the action of the Civil Service Commission in sustaining the action of the Borough Council discharging Chief Gabauer was factually and legally justified, and the Commission did not abuse its discretion in so doing.

"Appellant avers that he was denied due process of law because one of the three members of the Civil Service Commission, i.e. Donald H. Murray, was a member of Borough Council and he had participated in the investigation of the charges against appellant as a member of the Public Safety Committee and as a member of Council he had voted to discharge appellant.

"Appellant cites the case of Gardner v. Repasky, 434 Pa. 126 (1969), as authority for his position. In Gardner, supra, Repasky was a member of the Fire Board

that brought the original complaint and he subsequently served on the Civil Service Commission to consider the complaint. In that case, the Pennsylvania Supreme Court stated in its opinion on page 130 the following: 'A man cannot sit as judge when he is a member of a board which has brought the accusations. We held in Schleisinger Appeal, 404 Pa. 584, 172 A. 2d 231 (1931) where a prosecutor and a judge were combined in one body, the accused was denied a fair hearing to which due process of law entitled him.' However, in the instant case, Murray was not the prosecutor nor was he a member of a board that was the prosecutor. The Mayor brought the charges against Gabauer. After the Mayor's personal investigation of the Miller incident, it became apparent to him that Gabauer *had not told the truth* at the meeting with the Mayor and the Public Safety Committee, when he denied even knowing Miller (Rec. 81). The Mayor then asked the Chief to quietly resign or he would suspend him. The Chief failed to do this and the Mayor suspended him. The suspension was approved by Council and Council discharged the Chief. The initiating prosecution was from the Mayor and the mayor suspended him until the next regular meeting of council, this being the extent of his authority as Mayor. Borough Code, 1966, Feb. 1, P. L. (1965) No. 581, Sec. 1124; 53 P.S. 46124.

"Council considered the charges made by the Mayor as a deliberative body in the nature of judges and decided to sustain the Mayor's suspension and removed the Chief from the Police Force. The fact that Murray as a member of Council voted to sustain the suspension and remove the Chief does not indicate bias. Bias is not in rendering a deliberative judgment; bias is shown where there is a one-sided approach; where there is not an even handed consideration of the matter. There is no evidence that Murray indicated bias.

Under the Civil Service provisions of the Borough Code, the Commission shall consist of three commissioners who shall be electors of the Borough; one member of the commission may be a member of the Council of the Borough. Borough Code, 1966, Feb. 1, P. L. (1965) No. 581, Sec. 1172 and 1173; 53 P.S. Sec. 46171 and Sec. 46173. Therefore, Murray was properly a member of the Commission. The fact that, as a member of Council, he had already made a deliberative judgment to sustain the charges did not automatically disqualify him from sitting as one of the three members of the Commission to again consider and judge the charges in a full hearing. We must assume that Murray was able to act in an evenhanded and fair manner as a judge when he sat as a councilman to consider the charges and when he again sat as a member of the Civil Service Commission to consider the same charges.

"In the case of Vandergrift Borough v. Polito, 407 Pa. 286 (1962), the appellant, a policeman, was removed from his position by the Civil Service Commission of the Borough. He appealed on the grounds that certain improper evidence was presented at the hearing, and the Pennsylvania Supreme Court sent the case back for a new hearing before the Civil Service Commission. At the second proceedings before the Commission, two of the commissioners who presided at the original Commission hearing also sat as members of the Commission at the second hearing. The Commission again removed the policeman and he appealed the second time to the Supreme Court on the contention that, since two of the commissioners who presided at the original commission hearing and rendered an opinion on the evidence before it were called upon to once again review the same evidence, they could not honestly discharge their duty and therefore he was denied an unbiased opinion. The Pennsylvania Supreme Court

found that there was no fault and no bias in the second proceedings even though two of the three commission members in the first proceedings had rendered a judgment against the appellant. In his opinion in the Vandergrift case, supra, Mr. Justice O'Brien states at pages 287-288 as follows:

" 'His contention is that since two of the commissioners who presided at the original commission hearing and rendered an opinion on the evidence before it were called upon to once again review the same evidence, and could not honestly discharge their duty, he was denied an unbiased hearing.

" 'He does not charge the commissioners with improper conduct but rather the defect of human nature inherent in mankind which precludes the commissioners from divesting their minds of the improper evidence received at the first hearing.

" 'This reasoning overlooks the purpose of judicial and quasi judicial proceedings as well as the ability of honest men to perform the duty required of them as normal human beings endowed with intellect and reason. It also attacks the various governmental processes established for the safeguard of the rights of persons. This position is wholly untenable as being contrary to human experience. This is not a case where fraud or improper conduct of the commissioners is charged. No such accusation has been made and no evidence whatsoever appears in the record.

" '. . . the record discloses no fault and no violation of appellant's procedural and substantive statutory rights.'

"Mr. Murray's investigations of the Miller incident was as a member of the Public Safety Committee of Council. Along with the Mayor and four other members of the Committee, he heard Gabauer's statement on the evening following the incident. A few days after

the incident, he went with Mayor Camp and Mr. Pfeifer to Miller's house and talked to him for ten or fifteen minutes concerning the matter (R. 52). Later, on August 13, 1970, Miller made a statement taken down by a court reporter in front of Mr. Murray, Mayor Camp, and four other councilmen. Miller testified extensively on direct and on cross-examination at the hearing before the Commission. There is no indication but that what Miller stated in his preliminary statements was basically the same as the testimony he gave before the Commission; therefore, there is no reason to believe Murray had any information other than that fully disclosed at the Commission hearing. Because a man has learned something of a matter does not preclude him from being an unbiased judge when called upon to perform in that capacity. As Mr. Justice O'Brien stated in the Vandergrift Borough case, supra, at page 288: 'This reasoning overlooks the purpose of judicial and quasi judicial proceedings as well as the ability of honest men to perform the duty required of them as normal human beings endowed with intellect and reason.'

"At no time was Murray the prosecutor; he served only in the capacity of a judge when he considered these charges as a member of Council and when he considered the same charges as a member of the Civil Service Commission. No bias in fact has been shown, and it is assumed that he had the ability of an honest man to perform the duties of judgment required of him as a normal human being endowed with intellect and reason.

"Even if Murray's investigative activity in this case were found to have disqualified him and, therefore, invalidated his vote, the decision of the Commission would not be changed since the other two members of

the Commission also voted to sustain the removal of Chief Gabauer. Since his vote was not decisive, the presence of Mr. Murray on the Commission did not deprive the appellant of due process. Citta v. Delaware Valley Hospital, 313 F. Supp. 301 (E.D. Pa.) (1970). There is no reason to infer and there is nothing of record to show unfairness or bias on the part of the other two members of the Commission; the vote of these two, being a majority, constituted the fair and unbiased adjudication to which appellant was entitled as a part of due process. Donnon v. Downingtown Civil Service Commission, 3 Commonwealth Ct. 366, 369 (1971).

"In addition to their being a fair and unbiased valid adjudication in this case, the other fundamental requisites of due process of law were provided; i.e., the opportunity to be heard and to confront one's accusers. Grannis v. Ordean, 234 U.S. 385, 394, 34 S. Ct. 779, 783; Willner v. Committee on Character and Fitness, 373 U.S. 96, 140, 83 S. Ct. 1175, 1180 (1963).

"Statutory procedures of notice of the charges and the time of hearing were followed. At the hearings before the Commission, Gabauer was represented by competent counsel, the Borough was represented by counsel, and the Commission was represented and advised by its own separate legal counsel. The parties were given full opportunity to be heard and to cross examine adverse witnesses.

"We find that appellant was provided due process of law and there has been no violation of the appellant's procedural and substantive rights.

"We conclude that, both factually and legally, there was just cause for the Borough Council to discharge John W. Gabauer; and the Civil Service Commission of the Borough of Rochester did not abuse its discretion in sustaining the action of the Council.

## ORDER

"Now, the 16th day of May, 1972, the appeal of John W. Gabauer is denied. The decision of the Civil Service Commission of the Borough of Rochester is sustained, and the action of the Borough Council of Rochester discharging John W. Gabauer is sustained and affirmed.

BY THE COURT
s/ John N. Sawyer
P.J."